[Civ. No. 25498.   Second Dist., Div. Three.   May 10, 1962.]

PAULINE MacDONALD, Individually and as Executrix, etc., Plaintiff and Respondent, v. CALIFORNIA-WESTERN STATES LIFE INSURANCE COMPANY et al., Defendants and Appellants.

Frank M. Benedict for Defendants and Appellants.

Davidson & Russ and Edmond J. Russ for Plaintiff and Respondent.

SHINN, P. J.—Plaintiff Pauline MacDonald, suing on behalf of herself and as executrix of the estate of her deceased husband, Malcolm E. MacDonald, recovered judgment against California-Western States Life Insurance Company and Occidental Life Insurance Company of California in the amount of $13,089 upon a policy of insurance of the life of Mr. MacDonald. The defendants appeal.

The policy which bound the insurers in equal amounts was payable to the Department of Veterans Affairs of the State of California and was issued under the following circumstances. March 29, 1957, the department contracted with Mr. MacDonald to sell him a residential property for the sum of $13,600, payable in equal monthly payments of $77, with certain additional sums for taxes, etc. The purchaser agreed to furnish insurance, including insurance on his life, payable to the department, which agreed to apply all sums received under the policy to the balance unpaid upon the contract of purchase, and the policy that was issued obligated the insurers to pay such amount as might be unpaid under the contract, if upon the death of Mr. MacDonald they were liable under the policy. By appropriate agreement Mrs. MacDonald became a party to the purchase contract.

In order to obtain the insurance in compliance with his contract with the department, Mr. MacDonald was required to make application by means of answers to questions concerning his insurability contained in questionnaires respecting his health and medical history.

One set of questions was propounded by the Department of Veterans Affairs. The questions and answers which are material for consideration were the following: Question No. 7: "Do you know of any impairments now existing in your health or physical condition?" to which Mr. MacDonald answered "No"; question No. 8: "Have you had any illnesses or injuries during the past three years?" to which he answered "No"; question No. 9: "Have you ever had any of the following: . . . Disease of heart . . . or any other disease?" to which he answered "No." Beneath the questions and answers and above the signature of MacDonald, the following appeared: "I hereby certify that the above answers

and statements are true and correctly recorded and that no material circumstances or information has been withheld or omitted concerning my past and present state of health or employment and I hereby consent that this statement may be made part of any application for insurance on my life made by Department of Veterans Affairs.''

Mr. MacDonald was also required to answer questions on a form of application for insurance to California-Western States Life Insurance Company for the benefit of the medical examiner of the company. To question No. 16 ''What illness, diseases, accidents or operations have you ever had and for what conditions have you consulted a physician?'' the answer was: ''T & A 1910 Columbus, Ohio Appendectomy 1932 Dr. Rainer, Gazoo City, Miss. Repair of Hernia 1955 Dr. Norman, San Pedro, California.'' To question No. 17 ''Are you now in good health, as far as you know?'' the answer was ''Yes.'' To question No. 18 ''Have you consulted a physician or other practitioner within five years?'' the answer was ''Yes. To have 'shots' for trip to Mexico, discovered hernia, repaired 1955. Dr. Norman, San Pedro, Calif.'' Question No. 23 was ''Have you now, or have you ever had a nervous breakdown, epilepsy, loss of consciousness, rheumatism, tuberculosis, pleurisy, asthma, spitting of blood, gall stones, ear abscess, any disease of the nervous system, heart, lungs, stomach, kidney or liver, or any other disease or injury?'' and the answer was ''Not to my knowledge.'' Beneath this was the statement: ''I hereby declare that all statements and answers as written or printed herein, are full, complete and true, whether written by my own hand or not, and I agree that they shall form part of the contract for insurance on my life with California-Western States Life Insurance Company.'' The medical examiner of the company stated in his report that he was satisfied with the substantial correctness of all answers and applicant ''appears to be a standard risk.''

The contract of insurance was issued effective March 15, 1957. Mr. MacDonald died October 26, 1958, at the age of 55, at which time there was an unpaid balance on the contract of $13,089. According to the autopsy report, the cause of death was basilar artery thrombosis ''approximate interval 3 weeks due to arteriosclerosis'' of 10 years' duration. Due proof of death was furnished by Mrs. MacDonald. The insurers made an investigation of the claim and denied liability by letter with a check for $108.15 which was the total amount

of premiums paid the companies for the insurance. The check was accepted and cashed by the department prior to the commencement of this action.

In their answer to the complaint the insurance companies alleged that in his application for insurance MacDonald made the statements in answers to questions which are quoted and the same were false and untrue and that "said Malcolm E. MacDonald had suffered, for several months prior to the time of said application, from vascular hypertension, thickening of the blood vessels and coronary insufficiency and that the said Malcolm E. MacDonald had in fact consulted a physician within five years prior to said medical examination because of the aforementioned conditions, to wit, during the years 1955 and 1956 and on February 11, 1957, when he consulted with Dennis Fabian, M.D. of San Pedro, California, with reference to said conditions; that the said Malcolm E. Mac-Donald knew of the aforesaid impairment then existing in his health or physical condition at the time of making said statement of insurability and the said Malcolm E. MacDonald was not at the date of the said medical examination in good health as he well knew and believed but was in fact in bad health as he well knew and believed." It was then alleged that said defendants denied liability and returned to the Department of Veterans Affairs the sum of $108.15 which was received as the total amount of premiums theretofore paid to the companies.

Following the proof of death the companies made an investigation. In interviewing Dr. Norman, who performed an operation for hernia on Mr. MacDonald in 1955, they learned from him that he had taken the medical history of MacDonald in connection with his examination preparatory to giving him and his wife shots for a trip to Mexico.

Dr. Norman's deposition was taken and introduced in evidence. It was shown by the doctor's records MacDonald was suffering from a hernia, which necessitated repair and that both before and after the operation was performed electrocardiograms had been taken by two different cardiologists. Dr. Norman read from his records as follows: " 'Feels quite well except that he becomes physically exhausted very quickly on any moderate exertion. Was sent home from Guam on account of fatigue. Has had EKG's'—that means electrocardiograms—'and told his vessels were thickened. . . . Operated for a ruptured appendix about 20 years ago, followed by drainage and later an incisional hernia resulted. This worries

him some since he feels it might be physically depressing to him. His wife says he has lost interest in things, including people and even his own family, depends on her to an extreme. Used to golf and so forth but quit all that. Comes home from office exhausted and goes right to bed and sleeps about three or four hours soundly—then awakens and eats a lot of food. Later he frequently awakens and sits up in bed complaining of pain in his left chest. Has been to a cardiologist who told him it was a thickening of the blood vessels'—presumably the heart." (This was Dr. Norman's interpretation.) The witness was asked whether the statement "He has been to a cardiologist who told him his trouble was a thickening of the blood vessels" was made by Mrs. MacDonald or Mr. MacDonald and he answered that he would not know. The court asked whether the statements about playing golf and that he would sleep for three or four hours and then eat a lot of food, then sit up, were made by Mrs. MacDonald and the witness answered "They were statements by Mrs. MacDonald." Questioned whether the statement that Mr. MacDonald had had electrocardiograms taken and was told that his blood vessels were thickened was obtained from Mr. MacDonald, the witness said that would be his interpretation, "because apparently the first part of this history, until it comes to the point where I said, 'His wife says—' previous to that all information obtained directly from him, from Mr. MacDonald" and that the remainder of the statement beginning "His wife says" was obtained from Mrs. MacDonald.

The report of Dr. Roger Aubuchon of the cardiogram taken August 30, 1955, read as follows: "ELECTROCARDIOGRAPHIC INTERPRETATION: Name: McDonald, Malcolm, Age: 53 years Norman Clinic, Date: 8/30/55. Rate—82. Rhythm—Sinus. Electrical heart position—Indeterminate. PR interval is .17 sec. QRS interval is .08 sec. T waves are low in leads 1 and V-6. T waves are upright in leads 2, 3, AVF, V-1, V-2, V-3, V-4, V-5. T waves are inverted in leads AVR. T waves are flat in lead AVL. There is a deep S wave in lead 1. There is a small S wave in lead V-6. ST segments are slightly depressed in lead 2. Impression: Borderline electrocardiogram. Note: No evidence of acute damage. T waves in leads 1 and V-6 are somewhat low."

The second interpretation by Dr. Peter J. Rubino, September 30, 1955, read as follows: ELECTROCARDIOGRAPHIC INTERPRETATION: Name: McDonald, Malcolm, Age: 53 years. Nor-

man Clinic, Date: 9/30/55. Rate—85. Rhythm—Sinus. Electrical heart position—Intermediate. PR interval is .12 sec. QRS interval is .08 sec. T waves are upright in leads 1, 2, 3, V-1 to V-6. Slight ST depression in lead 1, V-4, V-5 and V-6. Impression: Electrocardiogram consistent with lateral wall ischemia. Note: Compared with tracing of 8/30/55 ST depression is more pronounced in V-3 to V-6. Consistant with coronary insufficiency."

The companies also learned of MacDonald's visits to Dr. Fabian which will be discussed later.

The issues that were tried were whether the decedent made such representations in connection with his application for the insurance as to bar recovery and whether the insurance contract had been rescinded by the companies and the department.

The material findings on the first issue were (1) that decedent made no false or untrue statements in his application for the insurance, (2) he made no false or fraudulent statement with intent to deceive, and (3) he did not know of any impairment to his health or physical condition and did not know of any illness or disease of which he might be suffering.

Defendants challenge these findings as unsupported by the evidence. The findings were sufficient to support the judgment. The question is whether they were justified by the evidence. We have concluded that the evidence fully supports them.

Although the answer of defendants alleged that MacDonald concealed only the fact that he had consulted Dr. Dennis Fabian in the years 1955, 1956 and 1957, the issue was broadened by the pretrial order so as to permit defendants to produce evidence of any other misstatements in the application.

First to be considered is the fact that decedent answered question No. 16 "No."

The most far-reaching portion of that question was "for what conditions have you consulted a physician?" Only three physicians had been consulted, the cardiologist in 1952, Dr. Norman in 1955 and Dr. Fabian late in 1956 and early in 1957. Mrs. MacDonald testified to the circumstances under which the cardiologist and Dr. Norman were consulted. She suggested to her husband that he consult a cardiologist in 1952 for the sole reason that he had been tired and nervous. Other evidence which indicated the existence of this condition

was developed in the examination of MacDonald by the company's physician, Dr. Warnock. In the answers to questions asked for the benefit of the medical examiner MacDonald stated that he was receiving a pension from World War II; he was chief warrant officer in the Seabees; he became nervous, which was recognized as combat fatigue; he was returned to the States after landing on Guam because of combat fatigue and was not given a medical discharge; he had no subsequent trouble. Evidently, this condition was what prompted Mrs. MacDonald to suggest a visit to the cardiologist. Next to be consulted was Dr. Norman in 1955. The reasons for the services of Dr. Norman were also explained in the testimony of Mrs. MacDonald. She and her husband were intending to take a trip to Mexico and this was one of their reasons for going to Dr. Norman. Another was that she thought it would be advisable for each of them to have a general checkup, which they had never previously had. They did not consult Dr. Norman for the purpose of having cardiograms taken. Nothing was said to Dr. Norman which indicated that MacDonald was apprehensive of a heart condition. The advisability of cardiograms was suggested to Dr. Norman when he found during the course of a general physical examination that MacDonald was in need of an operation for hernia. There was no evidence that the services of Dr. Norman were sought because of any disease or illness from which MacDonald believed himself to be suffering. Aside from the desire to have inoculations preparatory to a trip to Mexico there was no purpose in consulting Dr. Norman other than to receive a physical check-up.

The next visits were described by Dr. Fabian who testified that he succeeded to Dr. Norman's practice; that decedent first consulted him September 25, 1956, complaining that he was always feeling tired; his blood pressure was found to be 160/90; on October 8th, it was 120/80, November 6th, 145/90, December 21st, 160/89, January 7, 1957, 180/100, January 12, 1957, 130/100; on January 26th, no blood pressure was taken. The doctor diagnosed MacDonald's condition as "run down" and prescribed vitamins, but no other treatment. These visits to Dr. Fabian were not disclosed in decedent's answers upon his application. The reason for the visits was explained in the testimony of Dr. Fabian. MacDonald was always feeling tired. There was no evidence that MacDonald visited Dr. Fabian for any reason other than that he tired easily.

Mention here may be made of certain facts developed during MacDonald's examination by Dr. Warnock. MacDonald weighed 184½ pounds; he was 5 feet 8 inches in height. Dr. Warnock reported in part: "Applicant is robust. A little more tummy than he should have. Alert and active." It is apparent that the condition of MacDonald that had caused his being released from the Seabees had persisted and that it was the reason for his consulting the cardiologist in 1952 and Dr. Fabian in 1956. This is the conclusion that presumably was reached by the trial court and we think it was justified by the evidence.

It may be noted that in the statement to the department as to the truth of the answers of MacDonald there is a statement that "no material circumstance or information has been withheld or omitted concerning my past and present state of health" etc. The word "material" was properly used for the reason that a statement of every slight ailment or indisposition the applicant had suffered from would contain much that would not be material to the question whether he was an acceptable risk.

However, as the trial court presumably found, the visits of MacDonald to the cardiologist and to Dr. Fabian were made only because he was suffering from fatigue and was tired and nervous. It was not necessary that this information be contained in the application. ██ As stated in *Ransom* v. *Penn Mutual Life Ins. Co.*, 43 Cal.2d 420, 427 [274 P.2d 633]: "It has been held that questions concerning illness or disease do not relate to minor indispositions but are to be construed as referring to serious ailments which undermine the general health. (*Pierre* v. *Metropolitan Life Ins. Co.*, 22 Cal.App.2d 346, 349-350 [70 P.2d 985]; *Travelers Ins. Co.* v. *Byers*, 123 Cal.App. 473, 477-478 [11 P.2d 444]; *Poole* v. *Grand Circle W.O.W.*, 18 Cal.App. 457, 459 [123 P. 349].)" (See *Scroggs* v. *Northwestern Mut. Life Ins. Corp.*, 176 Cal. App.2d 300, 303 [1 Cal.Rptr. 189].)

██ It is well settled that the failure to mention in an application for insurance the existence of a condition of which the applicant has no knowledge or appreciation is not misrepresentation affecting the validity of the policy. (*Brubaker* v. *Beneficial etc. Life Ins. Co.*, 130 Cal.App.2d 340 [278 P.2d 966].)

██ The finding that MacDonald truthfully replied to the question "For what conditions have you consulted a

physician?" has support in the evidence for the reason that he did not misstate or conceal any material fact of which he had knowledge.

The answer to question No. 7 whether MacDonald knew of any existing impairment to his health or physical condition, the answer to question No. 8 whether he had had any illness during the past three years, the answer to question No. 9 whether he had ever had disease of the heart, the answer to question No. 16 in so far as the question related to illnesses or diseases for which MacDonald had consulted a physician and the answer to question No. 17 whether he was in good health as far as he knew may be grouped together. These questions called for the disclosure by MacDonald of his knowledge of any illness or disease from which he was suffering or had suffered in the past. In his case they related only to his knowledge or lack of knowledge of impairment of the functioning of his heart.

The evidence relative to the visit to the cardiologist in 1952 was that he had been informed that his condition was due to thickening of the blood vessels. Mrs. MacDonald testified "He [the cardiologist] told him that there was nothing for him to worry about, and to just go on and just forget it. He felt that this nervous condition he had from the war was what was causing him to be worried about himself."

It is contended by defendants that MacDonald knew at the time he consulted Dr. Norman, and as a result of his visit, that he was suffering from a heart condition. Emphasis is placed upon the statement of Mrs. MacDonald that her husband had had pains in his chest during the night. She testified this had occurred three or four, perhaps five, times. "He was a big eater." Upon the occasions when he suffered from the pains he had come home from work exhausted, had gone to bed and slept three or four hours, had then arisen and eaten "a lot of food." He suffered occasionally from indigestion and from gas on his stomach, but the chest pains occurred only upon rare occasions. Dr. Norman testified that such pains could be due to a variety of causes, other than a heart condition. If the pains had traveled from the chest to the left arm, it would have indicated some impairment of the heart and he would have prescribed some treatment for it. In the absence of that symptom he did not deem it necessary or advisable that MacDonald be treated for a heart condition. He gave no such treatment and advised none. Dr. Norman testified that it

would have been good practice to inform MacDonald that the first cardiogram was interpreted as "borderline" but he could not recall having discussed it with him. He also doubted that he had mentioned the results of the second cardiogram. He did not consider it necessary to discuss it because the second cardiogram showed no material change after the first cardiogram was taken which contained the note: "No evidence of acute damage."

As the court believed MacDonald did not attribute the thickening of the blood vessels to coronary impairment, it also believed that as a layman he did not know or have reason to know that the word "borderline" indicated impairment of the functioning of the heart. It could have meant to Mac-Donald that the condition was on the safe side rather than the unsafe side.

There was no evidence that MacDonald suffered any chest pains from the time he visited Dr. Norman to the time he visited Dr. Fabian and no evidence that during this interval the condition of his health had changed in any way. It was a reasonable conclusion that MacDonald realized he was not possessed of a robust constitution and believed that he was merely suffering from a lack of vigor which had developed while he was in the service and had caused the persistence of a nervous and tired condition.

The defendants call attention to one test made by Dr. Fabian which showed a blood pressure reading of 180/100 and they refer to the testimony of Walter C. Kennedy, Vice-President and Chief Underwriter of California-Western States Life Insurance Company, that an applicant with such a blood pressure would not be an acceptable risk. They argue that MacDonald must have known that this blood pressure reading indicated he was suffering from an illness or disease and that his answer to question No. 8 that he knew of no disease or illness from which he was then suffering was false. We find no merit in this argument. Mr. Kennedy testified that a reading of 160 to 165 might be acceptable, but there was no evidence that a blood pressure of 180/100 upon a single occasion would be of any particular signifiance if frequent earlier and later readings were within normal limits. Between October 9, 1956 and January 12, 1957, the blood pressure varied from 120/80 to 160/90, except for the reading taken January 7, 1957 of 180/100. At the time of Dr. Warnock's examination the blood pressure was 140/80. Dr. Norman testified that a

reading of 180/100 would not indicate a sclerotic condition unless it was continually repeated and it would not indicate that condition if the person was extremely nervous or apprehensive, "Some people when they are having an examination become very apprehensive and for a time their pressure will be higher than normal." The fact that a person was extremely nervous would not indicate a vascular change. Dr. Fabian testified that the fluctuation in the blood pressure readings indicated that MacDonald was a person who could be easily upset emotionally but the importance of blood pressure readings is whether they indicate a constant or a fluctuating condition.

MacDonald made no specific complaints to Dr. Fabian other than that he was frequently tired. There was nothing in the doctor's examinations that indicated he was suffering from any illness that required treatment. MacDonald was never advised by any physician that he was suffering from or threatened with heart trouble. He never stated that he suspected he was suffering from any illness or disease. He never complained of a condition that would have indicated impairment of the heart except perhaps the fact that he suffered a few times from pains in the chest, but these, even to Dr. Norman, were not of themselves necessarily indicative of impairment of the heart and could have been attributed to a number of other causes. There was no evidence that MacDonald had been confined to his bed or had been absent from work on account of illness.

In their argument that MacDonald concealed material facts defendants rely upon the evidence that he had been told his blood vessels were thickened, he had been told that a cardiogram had been interpreted as indicating a borderline heart condition, that he had experienced chest pains as described by Mrs. MacDonald and at one time had had a blood pressure of 180/100. It is contended that upon this evidence the court was required to find that MacDonald knew he was suffering from a disease of the heart and that his answers to the contrary were false and fraudulent. We are of the opinion that the contention is clearly untenable. It is true that MacDonald had suffered some damage to his heart, perhaps as early as his service in the Seabees, but we think the court correctly found that he did not know he was suffering from an illness or disease of the heart. The cardiologist told him there was nothing to worry about. Dr. Norman believed there

was no occasion to give him any warning or to suggest any treatment. It was reasonable for the court to conclude that the terms "thickening of the blood vessels" and "borderline" meant no more to him than the words "mild hypertension" of which the court said in *Ransom* v. *Penn Mutual Life Ins. Co., supra,* 43 Cal.2d 420, 426 : "but it does not appear that he knew what the term meant, and, as a layman, he might reasonably have failed to understand that it had any relation to blood pressure."

Defendants contend they had a right to cancel their policy with the consent of the department for the reason that the contract was between the companies and the department and not with the insured. They quote the following provision from the policy : "The application for this policy having been made by the Board, it is understood and agreed that the insurance contract is made with said Board and that every transaction relating to this policy, including the right to exercise every option, benefit or privilege conferred by, or referred to, in this policy, shall be between the Company and the Board, and that all such transactions shall be valid and binding on the insured, without notice to, or consent of the insured." The policy contains no provision that it might be cancelled by agreement of the companies and the department. The companies did not undertake to cancel the policy under any claimed right to rescind it upon any ground other than the claimed misrepresentations in the application. As between the department and the MacDonalds the only right the department had to terminate the contract was stated to be the MacDonalds' failure to perform the obligations they assumed. Nowhere does it appear that the department had a right to consent to the cancellation of the insurance contract. Defendants rely upon a statement in the opinion in *Robinson* v. *Occidental Life Ins. Co.,* 131 Cal.App.2d 581, 586 [281 P.2d 39], in which the policy involved was identical with that in the present case. There the company denied liability for causes which were found to be sufficient. The department was notified of the company's decision and accepted a check for the premiums that had been paid on the policy in the amount of $34.75. On appeal, the judgment in favor of the defendant was affirmed upon the ground of misrepresentation made by decedent in his application for a policy. After this holding the following statement was added to the opinion (p. 586) : "Finally, appellant's hopes for recovery were blasted by the

rescission of the insurance contract prior to the commencement of this action. It is the law that 'a contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it.' (Civ. Code, § 1559.) The mutual rescission, as found, terminated the contractual rights of appellant.''

The quoted statement appears to be contrary to settled principles of law. It seems to indicate that the insurance company and the department may mutually rescind the insurance after the death of the veteran and that such rescission is binding upon the veteran's widow without her consent, whether the insurance company had grounds for rescission or not. The term "mutual rescission" was inappropriately used. The company in *Robinson* had merely denied liability and returned the premiums that had been paid by the insured. So it was in the present case but this was not consent on the part of the department to release all the rights of the beneficiary under the policy.

The theory expressed in the *Robinson* case is that the veteran and his widow were not parties to the insurance contract, but were mere third party beneficiaries whose rights could be cut off by the action of the actual parties to the contract. Such a holding is inconsistent with the following rules: (1) Mr. and Mrs. MacDonald were actual parties to the insurance plan and not third party beneficiaries. The term "third party beneficiary" refers to someone who is not a promisee. (Rest., Contracts, § 133.)

Mr. and Mrs. MacDonald contracted with the department to finance the purchase of a home. The department required MacDonald to apply for life insurance, which he did. The insurance contract provides that the proceeds will be paid to the department and that the department will apply the proceeds to discharge the indebtedness of the MacDonalds (who were jointly liable on the home purchase agreement). The MacDonalds paid the premiums. It seems clear that they were parties to the bargain when it was originally negotiated, and they were promisees both of the insurance companies' promise to pay benefits and the department's promise to use the benefits to discharge the MacDonalds' debt. (2) In the ordinary life insurance situation, where the person whose life is insured pays the premiums, the beneficiary under the policy is considered to be a donee beneficiary. (Rest., Contracts, § 142; 4 Corbin on Contracts, pp. 81 and 211.) Unless the

insured has reserved the right to change the beneficiary, the contract cannot be varied or cancelled without the consent of the beneficiary. (*Griffith* v. *New York Life Ins. Co.,* 101 Cal. 627 [36 P. 113, 40 Am.St.Rep. 96] ; *Denike* v. *Denike,* 86 Cal. App. 493, 495 [261 P. 322] ; 4 Corbin on Contracts, p. 248.) See the California annotations to the Restatement of Contracts, section 142, which points out that Civil Code, section 1559, has never been applied in an insurance case to permit rescission without the beneficiary's consent. (3) The present case is much stronger than the situation referred to above where the owner of the policy attempts to cancel it during his lifetime. After the death of MacDonald, the insurance companies' duty to pay for Mrs. MacDonald's benefit is unconditional, all of the other parties to the contract having fully performed.

The judgment is affirmed.

Files, J., concurred.

Ford, J., did not participate.