[S.F. No. 22951. In Bank. Aug. 27, 1973.]

RUTH M. THOMPSON, Plaintiff and Respondent, v.
OCCIDENTAL LIFE INSURANCE COMPANY OF CALIFORNIA,
Defendant and Appellant.

## COUNSEL

Sullivan, Roche & Johnson, Theodore A. Kolb, Gerald J. O'Connor and Ronald H. Kahn for Defendant and Appellant.

Bennett, Van De Poel, Campbell & Ginder, Bryant M. Bennett and Joan Mendelson Sautter for Plaintiff and Respondent.

## OPINION

**BURKE, J.**—We are asked to decide whether, under the particular facts of this case, a contract of life insurance existed between plaintiff's deceased spouse and defendant insurance company, and if so, whether decedent's alleged misrepresentations regarding the state of his health and past medical history rendered that contract void and unenforceable. The trial court, aided by an advisory jury, found in plaintiff's favor and awarded her $200,000, plus interest. Defendant appeals. We have concluded that the judgment should be affirmed.

Donald L. Thompson, husband of plaintiff Ruth M. Thompson, was insured by defendant Occidental Life Insurance Company of California ("Occidental") under a $15,000 life insurance policy which provided for double indemnity for accidental death. Concerned about the adequacy of his medical and life insurance, Thompson contacted John Kelly, the Oakland manager of Occidental, for the purpose of increasing his insurance coverage. Kelly then met with Thompson's accountant to determine what type of policy Thompson should purchase and decided upon a five-year convertible term policy for $100,000 with double indemnity for accidental death. On August 5, 1964, Thompson signed an application for the recommended policy and on August 11 submitted to a medical examination.

Two days after the medical examination, Kelly went to Thompson's office and requested payment of the first premium on the policy. Although his testimony was somewhat imprecise, perhaps because of the passage of time, Kelly recalled explaining to Thompson that if he failed to pay the first premium, he would not be covered in the meantime even if he were ultimately found insurable. However, Kelly was not able to recall whether he actually told Thompson that a premium payment would not assure interim coverage should Thompson prove uninsurable. At one point in his deposition testimony, read into the record at trial, Kelly stated that "I was thinking in terms of suppose this guy goes and completes his application, everything is done, and he wouldn't have been insured. Here he has no coverage because he hasn't any premium paid, and that was all that was in my mind. I wasn't thinking in terms of all the technical stuff in here now . . . ." Thompson paid the requested premium to Kelly the next day.

Thompson's application was received by Occidental's underwriters on August 17. The underwriters decided to require an additional medical examination. On August 24, before he was informed of this decision, Thompson sustained an accident (falling into his bathtub and nearly suffocating) which resulted in his death four days later. Occidental determined

that Thompson's death was accidental and paid plaintiff, as beneficiary, $30,000 as double indemnity under the $15,000 life insurance policy. However, Occidental notified plaintiff on September 4 that it would neither issue nor make payment under the $100,000 life insurance policy because the additional medical examination had not been completed. Thereafter, Occidental returned to plaintiff the first premium by a check drawn on its own account. Plaintiff retained the check and sued to recover $200,000 as double indemnity under the $100,000 policy and, as indicated above, judgment was entered awarding plaintiff $200,000 and $82,108.60 as interest. Defendant appeals.

## 1. *Formation of Insurance Contract*

Defendant's first contention is that no insurance contract ever came into existence, since no policy was ever delivered to Thompson, since he had not completed the second medical examination required by Occidental, and since Thompson was ultimately found to be uninsurable by Occidental. To support its contention, defendant relies on the language of its own standard form application executed by Thompson.[1] This court, however, in *Ransom* v. *Penn Mutual Life Ins. Co.*, 43 Cal.2d 420 [274 P.2d 633], considered similar contract language[2] in an almost identical factual set-

[1]The application provided that "Any policy issued on this application shall not take effect unless and until the full first premium is paid and the policy is delivered to the Owner during the lifetime and good health of the Proposed Insured, *except as otherwise provided in the receipt* which has the same number as Part I of this application." (Italics added.)

The receipt, which was attached to the application at the time that Thompson signed it, but was not given to him when he paid the first premium, states:

"THE PAYMENT ACKNOWLEDGED BY THIS RECEIPT IS MADE AND RECEIVED SUBJECT TO THE FOLLOWING CONDITIONS:

"(A) 1. If the medical examinations, if any, required by the Company are completed, and

"2. If the Company at its Home Office is satisfied that at the time of completing both Part I and Part II of the application the Proposed Insured was insurable under the Company's rules for a policy on the plan, in the amount, at the class of risk and otherwise exactly as applied for in Part I of the application with the same number as this receipt, then, but only after such conditions are met, the insurance will be effective from the date of Part I, the date of Part II, or the date specifically requested in the application, whichever is the latest, regardless of death or change of insurability of the Proposed Insured occurring after completion of both parts of the application. . . ."

The receipt provided in bold face type that "This receipt is to be used *only if* payment is made at the time the application is signed; otherwise it must not be detached [from the application]." (Italics added.)

[2]The application in *Ransom* contained the following clause: "If the first premium is paid in full in exchange for the attached receipt signed by the Company's agent when this application is signed the insurance shall be in force, subject to the terms and conditions of the policy applied for, from the date of Part I or Part II of this applica-

ting[3] and resolved the issue in favor of the insured. In *Ransom* (p. 423), this court had to "determine whether a contract of insurance arose immediately upon receipt by defendant of the completed application with the premium payment, subject to the right of defendant to terminate the agreement if it subsequently concluded that Ransom was not acceptable, or whether . . . [defendant's] satisfaction as to Ransom's acceptability for insurance was a condition precedent to the existence of any contract."

We found in *Ransom* (p. 425) "that a contract of insurance arose upon defendant's receipt of the completed application and the first premium payment" and held that the "understanding of an ordinary person is the standard which must be used in construing the contract, . . ." We also found that an ordinary person reading the application could reasonably believe that "he would secure the benefit of immediate coverage by paying the premium in advance of delivery of the policy."

We do not believe that the language of the application in *Ransom* reasonably can be distinguished from the language of the application and receipt in the present case.[4] As the United States Court of Appeals, Ninth

---

tion, whichever is the later, provided the Company shall be satisfied that the Proposed Insured was at that date acceptable under the Company's rules for insurance upon the plan at the rate of premium and for the amount applied for, but that if such first premium is not so paid or if the Company is not satisfied as to such acceptability, no insurance shall be in force until both the first premium is paid in full and the policy is delivered while the health, habits, occupation and other facts relating to the Proposed Insured are the same as described in Part I and Part II of this application and in any amendments thereto."

[3]Ransom was solicited for insurance by an agent of defendant insurance company. A doctor selected by the insurance company examined Ransom and found nothing wrong with his physical condition. Ransom made a written application for insurance on a form provided by the insurance company and paid the first premium. In the application Ransom stated that he had previously been examined by a Dr. Long. In response to inquiries made by the insurance company, Dr. Long submitted to the insurance company a report in which he stated that Ransom visited him complaining of a "heavy feeling" in the chest and that an examination of Ransom revealed a "moderately obese patient with no important clinical findings," a normal electrocardiogram, and an above normal blood pressure which registered almost normal one week later. After receiving Dr. Long's report, the insurance company requested Ransom to submit to further medical examination but before this could be arranged Ransom was killed in an automobile accident. Several days after the accident, the insurance company, having received notice of Ransom's death, tendered to Ransom's wife the full amount of the first premium and informed her that Ransom's application could not be approved because of Dr. Long's report.

[4]Unlike *Ransom*, in this case the contract language regarding time of coverage was set forth in two separate documents, the application and the receipt. Occidental points out that the receipt, by its terms, was to become effective only if payment of the initial premium were made at the time of executing the application. Nevertheless, Thompson could reasonably assume that once he made payment the terms of the receipt would become operative. The language which purports to limit the effect of the receipt was

Circuit, observed in *Metropolitan Life Insurance Company* v. *Grant,* 268 F.2d 307, 309, the California courts make "no attempt . . . to draw fine distinctions from the various phraseology used in the numerous policies . . . ." ■ Of course, an insurance company is not precluded from imposing conditions precedent to the effectiveness of insurance coverage despite the advance payment of the first premium. However, as *Ransom* explains, any such condition must be stated in conspicuous, unambiguous and unequivocal language which an ordinary layman can understand. As the insurer is responsible for drafting the application, it is appropriate that he be required to choose plain and unequivocal terms. (See also *Slobojan* v. *Western Travelers Life Ins. Co.,* 70 Cal.2d 432 [74 Cal.Rptr. 895, 450 P.2d 271]; *Young* v. *Metropolitan Life Ins. Co.,* 272 Cal.App.2d 453 [77 Cal.Rptr. 382, 78 Cal.Rptr. 568]; *Koorstad* v. *Washington Nat. Ins. Co.,* 257 Cal.App.2d 399 [64 Cal.Rptr. 882]; *Wernecke* v. *Pacific Fidelity Life Ins. Co.,* 238 Cal.App.2d 884 [48 Cal.Rptr. 251]; *Brunt* v. *Occidental Life Ins. Co.,* 223 Cal.App.2d 179 [35 Cal.Rptr. 492]; *Metropolitan Life Insurance Company* v. *Wood* (9th Cir.) 302 F.2d 802; *Metropolitan Life Insurance Company* v. *Grant, supra.*)

■ Applying the test of the foregoing cases, we conclude that the trial court properly could find that a contract of insurance arose upon Thompson's payment of the first premium following his completion of the application and initial medical examination. Neither the language in the application and receipt nor the "explanation" given by Kelly was clear and unambiguous, and an ordinary man in Thompson's position might well assume that payment would bring immediate protection, at least until the insurer had notified him that he was uninsurable. (See *Wernecke* v. *Pacific Fidelity Life Ins. Co., supra,* 238 Cal.App.2d 884, 887.) In Kelly's words, it is probable that "the technical stuff" set forth in the application and receipt was never effectively brought to Thompson's attention. Of course, nothing would have prevented Occidental from rescinding its contract with Thompson *during his life,* upon determining that he was uninsurable. But, under *Ransom,* that right to rescind must be held to have terminated upon Thompson's death, at least in the absence of a material misrepresentation on Thompson's part.

In a further attempt to support its contention that no contract of insurance ever came into existence, Occidental asserts that Kelly did not have

---

obviously intended primarily to warn the applicant that the mere execution of the application, without payment of the first premium, would not afford coverage. Once he made that payment, Thompson stood in substantially the same position as the insured in *Ransom.* (Note that Kelly himself modified the application to show that Thompson had paid $205 "with application.")

authority to act on its behalf and waive the application's requirement that a policy be delivered before coverage would commence. Occidental again relies on the language of its own standard form contract which provided that "No waiver or modification shall be binding upon the Company unless in writing and signed by the President or a Vice President and the Secretary or an Assistant Secretary." Upon payment of the first premium by Thompson, Kelly modified the completed contract form by changing the "mode of premium payment" from "annual" to "monthly," scratching out "C.O.D." (which evidently meant "collect premium on delivery of policy") and substituting "$205" as "payment with application." Occidental contends that these "unauthorized" modifications were not binding upon the company because of the above quoted language, which assertedly put Thompson on notice that Kelly had no authority to modify the standard language of the policy application.

We cannot accept Occidental's position, for to do so would place undue burdens upon the applicant for insurance to inquire of soliciting agents regarding their authority and to verify the facts by independent inquiry with the company involved. Certainly the language of the application did not expressly deny Kelly's authority to make the modifications at issue, for Kelly might have been one of the designated officers. (Compare *Iverson* v. *Metropolitan Life etc. Co.*, 151 Cal. 746, 750-751 [91 P. 609].) Furthermore, the particular "modifications" are minor in nature, and relate only to payment of the premium in advance and in installments, common practices which an insured could reasonably conclude were entirely within the discretion of the agent to accept. The fact that the printed form provides for four alternative methods of payment — annual, semi-annual, quarterly and monthly (with squares after each to be checked indicating the method of payment desired), and for "payment with application," would lead an applicant to conclude that the matter was entirely optional. Although the form of the application itself is rather inconclusive as to the apparent right of the agent to make such adjustments, the law of agency supports our conclusion as to the extent of Kelly's authority.

Under Civil Code section 2315 et seq. an agent has (1) such authority as his principal intentionally confers upon him or intentionally or by want of ordinary care allows him to believe he possesses (§ 2316—actual authority), or (2) such authority as the principal intentionally or by want of ordinary care causes or allows a third person to believe the agent possesses (§ 2317—ostensible authority). The record indicates that Occidental allowed both Kelly and Thompson to believe that Kelly possessed the authority to act as he did. Kelly was Occidental's Oakland manager, had been employed by Occidental since 1952, and had previously received insurance

applications and collected premium payments with the applications, or shortly thereafter, without any instructions from Occidental as to limitations on his authority in such transactions. ■ "If a principal by his acts has led others to believe that he has conferred this authority upon his agent, he cannot be heard to assert, as against third persons who have relied thereon in good faith, that he did not intend to confer such power." (*Safeway Stores* v. *King Lumber Co.,* 45 Cal.App.2d 17, 22 [113 P.2d 483]; see also *Skyways Aircraft Ferrying Service, Inc.* v. *Stanton,* 242 Cal.App.2d 272, 280-281 [51 Cal.Rptr. 352].) ■ We conclude that the evidence would support a finding that Kelly had authority to bind Occidental.

### 2. *Misrepresentation*

■ Occidental's second contention is that, even if a contract of insurance were formed, it was rendered unenforceable by reason of misrepresentations by Thompson concerning his medical history. It is true that under certain circumstances material misrepresentations regarding the medical history of an applicant may justify the rescission of a life insurance contract (see Ins. Code, § § 330-361; Couch on Insurance (2d ed.) § § 67:348 and 67:361; 27 Cal.Jur.2d, Insurance, § § 204-229, 291-301, and cases cited therein). In the instant case, however, both the advisory jury, answering a special interrogatory, and the trial judge, exercising his independent judgment, found that Thompson did not misrepresent or conceal the state of his health and past medical history to Occidental. That finding is supported by substantial evidence.

The alleged misrepresentations occurred during the insurance medical examination on August 11, 1964, and pertain to matters set forth in Thompson's insurance application. The record discloses that Thompson did not fill out the application himself; instead, his oral responses were recorded by the examining physician, Dr. Epstein, a private practitioner on Occidental's "approved" list of physicians, who, by prior arrangement with Occidental, peformed medical examinations of insurance applicants. Dr. Epstein read the questions on the application to Thompson during a Friday afternoon session which included both a physical examination and completion of the questionnaire; since Epstein could perform three or four such examinations in an hour, Thompson's session may have lasted only 15 to 20 minutes. Occidental contends that Thompson misrepresented or concealed the answers to questions 5 and 6. Question 5 asked:

"During the past five years have you:

"A. Consulted, been examined or been treated by any physician or practitioner?

"B. Had an X-ray, electrocardiogram or any laboratory test or study?

"C. Had observation or treatment at a clinic, hospital, or sanitarium?

"D. Had or been advised to have a surgical operation?"

Dr. Epstein entered an affirmative answer to each portion of question 5 and noted the following on the portion of the application which requested details of affirmative answers: "5 ABCD—Vein ligation—Hernia, Providence Hosp. Oakland, 1963, M.C. Green MD 330 Elm St., Oakland, Cal." The "vein ligation" was a surgical operation involving the tying of the patient's veins; evidently, Thompson suffered from varicose veins, and the ligation was necessary to relieve this condition.

The pertinent portions of question 6 asked:

"Have you ever had or been told you had: . . .

"B. . . . pain or pressure in the chest, or any disorder of the heart, blood or blood vessels?

"C. . . . any disorder of the lungs, bronchial tubes, throat or respiratory systems?

". . . . . . . . . . . . . . . . . .

"I. Any disease, condition or disorder not indicated above?"

Epstein entered negative answers to each of these questions.

The alleged misrepresentations consist of Thompson's apparent failure to report to Epstein approximately 10 medical consultations he had at Kaiser Hospital with five different doctors which commenced on June 3, 1964, two months before the insurance medical examination, and ended only the day before the examination took place. During these consultations he (1) had complained of chest pain, (2) had an electrocardiogram performed, (3) was treated for "phlebitis" (vein inflammation), (4) was advised to keep off his feet to avoid the possibility that a clot in a leg vein might break off and travel to his lungs, (5) had his legs X-rayed for "intermittent claudication" (leg pain), and (6) was advised to undergo a "chemical sympathectomy" (injection of local anesthetic) to relieve the foregoing leg pain.

We first review the rules of law applicable in appraising a claim of misrepresentation in procuring insurance. ■ It is generally held that an insurer has a right to know all that the applicant for insurance knows regarding the state of his health and medical history. (*Cohen* v. *Penn Mut. Life Ins. Co.*, 48 Cal.2d 720, 727 [312 P.2d 241]; *Burns* v. *Prudential*

*Ins. Co.,* 201 Cal.App.2d 868, 869-870 [20 Cal.Rptr. 535].) Material misrepresentation or concealment of such facts are grounds for rescission of the policy, and an actual intent to deceive need not be shown. (*Cohen* v. *Penn Mut. Life Ins. Co., supra,* p. 725; *Cal.-West. States etc. Co.* v. *Feinstein,* 15 Cal.2d 413, 423 [101 P.2d 696, 131 A.L.R. 608]; *McAuliffe* v. *John Hancock Mut. Life Ins. Co.,* 245 Cal.App.2d 855, 857 [54 Cal. Rptr. 288]; see Ins. Code, § 331.) ■ Materiality is determined solely by the probable and reasonable effect which truthful answers would have had upon the insurer. (Ins. Code, § 334; *Burns* v. *Prudential Ins. Co., supra,* p. 871.) The fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law. (*Cohen* v. *Penn Mut. Life Ins. Co., supra,* p. 726; *Cal.-West. States etc. Co.* v. *Feinstein, supra,* p. 423; but see *Ransom* v. *Penn Mutual Life Ins. Co., supra,* 43 Cal.2d 420, 427.)

■ On the other hand, if the applicant for insurance had no present knowledge of the facts sought, or failed to appreciate the significance of information related to him, his incorrect or incomplete responses would not constitute grounds for rescission. (*Cohen* v. *Penn Mut. Life Ins. Co., supra,* 48 Cal.2d 720, 726; *Ransom* v. *Penn Mutual Life Ins. Co., supra,* 43 Cal.2d 420, 426; *McAuliffe* v. *John Hancock Mut. Life Ins. Co., supra,* 245 Cal.App.2d 855, 857; *Jefferson etc. Life Ins. Co.* v. *Anderson,* 236 Cal.App.2d 905, 909-910 [46 Cal.Rptr. 480]; *MacDonald* v. *California-Western States Life Ins. Co.,* 203 Cal.App.2d 440, 448 [21 Cal. Rptr. 659]; see Ins. Code, §§ 332, 333.) Moreover, "[Q]uestions concerning illness or disease do not relate to minor indispositions but are to be construed as referring to serious ailments which undermine the general health." (*Ransom* v. *Penn Mutual Life Ins. Co., supra,* p. 427; see *Cohen* v. *Penn Mut. Life Ins. Co., supra,* p. 725; *Jefferson etc. Life Ins. Co.* v. *Anderson, supra,* p. 910; *McAuliffe* v. *John Hancock Mut. Life Ins. Co., supra,* p. 857; *MacDonald* v. *California-Western States Life Ins. Co., supra,* p. 448.) ■ Finally, as the misrepresentation must be a material one, "An incorrect answer on an insurance application does not give rise to the defense of fraud where the true facts, if known, would not have made the contract less desirable to the insurer. [Citations.]" (*Ransom* v. *Penn Mutual Life Ins. Co., supra,* p. 427; see *Burns* v. *Prudential Ins. Co., supra,* 201 Cal.App.2d 868, 872.) And the trier of fact is not required to believe the "post mortem" testimony of an insurer's agents that insurance would have been refused had the true facts been disclosed. (*McAuliffe* v. *John Hancock Mut. Life Ins. Co., supra,* p. 858.)

■ Although there are several items on Occidental's list of alleged "misrepresentations," many items appear to relate to the ailment which

Thompson affirmatively disclosed in answering question 5, namely, his varicose vein problem which led to the vein ligation surgery. As we shall see, the remaining items seemingly pertained to minor matters likely to have been of no interest to Occidental. Since Thompson disclosed his basic problems with his veins and circulation, the trial court might have concluded that it was the responsibility of the examining doctor to elicit additional details as to causes, consultations, treatment, diagnosis and prognosis.

It is suggested by the dissent, however, that Thompson knowingly concealed from Occidental that he suffered from *two* major problems, namely, varicose veins and arteriosclerosis, that the two conditions were unrelated, and that the latter condition had substantially reduced Thompson's life expectancy. Yet this theory (which was not raised in defendant's briefs in this case) finds no support in the record. The dissent relies primarily upon testimony by one of defendant's witnesses, Dr. Thompson, who never examined decedent Thompson during his life, and who consequently never discussed the arteriosclerosis condition with him. Contrary to the suggestion in the dissenting opinion (*post,* p. 924), none of the physicians with whom decedent consulted testified that decedent was ever advised that he had arteriosclerosis, that this condition was unrelated to the past varicose vein problem disclosed to Dr. Epstein, or that this new "malady . . . would shorten his life span by one-half to two-thirds." (*Post,* p. 930.) In fact, with respect to the intermittent claudication (leg pain) which Thompson was experiencing, Dr. Pellegrin told Thompson merely that it had "something to do with circulation . . . ." According to Dr. Pellegrin, "You don't want to get somebody all wound up and alarmed and concerned about themselves and find out it isn't bad at all, and they are tense and anxious for no reason at all." From this testimony, the judge and jury could reasonably conclude that Thompson believed that he had a single leg circulation problem, related to his varicose vein condition. Accordingly, the finding that Thompson did not misrepresent his medical condition is supported by the evidence and the reasonable inferences which could be drawn from that evidence. As we have often stated, our reviewing power begins and ends with the determination whether there is any substantial evidence to support the trial court's findings. (E.g., *Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.,* 66 Cal.2d 782, 784 [59 Cal.Rptr. 141, 427 P.2d 805].) On the present record, we cannot say that the trial court's finding is wholly unsupported by substantial evidence when viewed in the light of the foregoing legal principles.

There are at least four additional possible bases to support the finding that Thompson did not misrepresent or conceal the facts. (1) The court

may have found that, in addition to disclosing his leg vein problems and surgery, Thompson also mentioned to Dr. Epstein the additional consultations regarding vein inflammation and leg pain but Epstein, in the course of hurrying to complete the brief examination, intentionally or inadvertently failed to record the information.[5] (See *Rutherford* v. *Prudential Ins. Co.*, 234 Cal.App.2d 719, 726-729 [44 Cal.Rptr. 697].) (2) The court may have believed that Thompson, as an ordinary layman, failed to recollect or appreciate the significance of the subject matter of the various Kaiser consultations. For example, the terms "phlebitis," "intermittent claudication," and "chemical sympathectomy" might well have been meaningless jargon to him. (3) Next, the court may have found that most of Thompson's undisclosed problems related to "minor indispositions" rather than serious ailments undermining the general health. For example, the chest pain of which he had complained was diagnosed as mild pneumonia and pleurisy caused by the pneumonia from which Thompson recovered in a single day following office treatment by a doctor. The electrocardiogram performed on Thompson showed no significant or abnormal tracings, and the X-rays of Thompson's legs were likewise negative. (4) Finally, the court may have determined that the subject matter of the Kaiser consultations would not have affected Occidental's decision to issue a policy; the court was not required to accept the contrary testimony of Occidental's officer.[6]

---

[5]Dr. Epstein could not recall what information Thompson in fact disclosed, although Epstein did testify that he customarily recorded all information furnished by the applicant in response to the questionnaire. The latter testimony may have been questioned by the trial court, for the record discloses that Epstein entered a negative response to the question calling for "evidence of past or present diseases or disorders of the . . . blood vessels," even though Thompson's legs bore visible scars of the vein ligation. Epstein also failed to indicate whether there was evidence of varicose veins, despite Thompson's disclosure of that problem to Epstein. (See also fn. 6, *infra.*)

It is true that Thompson signed the application himself, thereby certifying to the accuracy of the questionnaire. Although some cases have emphasized that applicants for insurance must read the application and report any misstatements or omissions (see *Telford* v. *New York Life Ins. Co.*, 9 Cal.2d 103, 107-108 [69 P.2d 835]), other cases have indicated that even if the applicant has signed the application, his omissions may be excused if it can be inferred that the examining doctor gave him the impression that additional written responses were unnecessary (see *Rutherford* v. *Prudential Ins. Co.*, 234 Cal.App.2d 719, 728 [44 Cal.Rptr. 697]; *Boggio* v. *Cal.-Western States Life Ins. Co.*, 108 Cal.App.2d 597 [239 P.2d 144]). Moreover, the fact that Thompson signed the application does not foreclose the argument that the information was immaterial to Occidental, or pertained to minor indispositions, or that Thompson failed to recall the facts or appreciate their significance.

[6]Occidental's officer, Mr. Ryan, testified that Occidental would have declined to issue a policy had Thompson fully disclosed his medical history. Ordinarily, "the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact." (Evid. Code, § 411; see *Hicks* v. *Reis*, 21 Cal.2d 654, 659-660 [134 P.2d 788]; *Camp* v. *Ortega*, 209 Cal.App.2d 275, 281-285 [25 Cal.Rptr. 873]; *Krause* v.

■ Occidental asserts that there is no substantial evidence in the record to explain the incomplete responses on the insurance application. Yet we must remember that Thompson himself was unavailable for direct interrogation, and Dr. Epstein, who recorded Thompson's responses, was unable to remember the substance of their conversation. (See fn. 5, *ante*.) Under such circumstances, were the burden of proof upon them, the insured's beneficiaries would have a nearly insurmountable proof problem in establishing a satisfactory explanation for the various omissions in decedent's application for insurance. Yet under the authorities, the burden of proving misrepresentation rests upon the insurer. (See *Farmers Auto. etc. Exch.* v. *Calkins,* 39 Cal.App.2d 390, 393 [103 P.2d 230]; *Mayfield* v. *Fidelity & Casualty Co.,* 16 Cal.App.2d 611, 616 [61 P.2d 83]; Evid. Code, § 520.) Some cases have even assumed that fraud must be proven by "clear and convincing" evidence. (See *K. King and G. Schuler Corp.* v. *King,* 259 Cal.App.2d 383, 396 [66 Cal.Rptr. 330]; *Farmers Auto. etc. Exch.* v. *Calkins, supra,* p. 393; but see *Sierra Nat. Bank* v. *Brown,* 18 Cal.App.3d 98, 104-106 [95 Cal.Rptr. 742] [preponderance of evidence sufficient].) Thus, the burden was on Occidental to negate to the satisfaction of the trier of fact the various plausible explanations for the incomplete answers on Thompson's application.

■ Under the facts in this case, it is conceivable the court could have found that Thompson withheld pertinent information and to that extent misrepresented the facts. Yet, as we have pointed out, the court was entitled to find to the contrary based upon its appraisal of the testimony, the credibility (or lack thereof) of Occidental's witnesses, and the fair inferences arising from the evidence. It is not our function to second guess the trier of fact in such matters.[7]

---

*Apodaca,* 186 Cal.App.2d 413, 417-419 [9 Cal.Rptr. 10].) Yet the trial court was entitled to withhold "full credit" from Ryan's testimony, either on the basis of his relationship with Occidental (see Witkin, Cal. Evidence (2d ed. 1966) § 1113), or his manner of testifying (*id.,* § 1115). (See *McAuliffe* v. *John Hancock Mut. Life Ins. Co., supra,* 245 Cal.App.2d 855, 858; *Hicks* v. *Reis, supra,* p. 660.) This same reasoning could apply to Dr. Epstein's testimony; in addition, that testimony was not "direct evidence" (see Evid. Code, § 410) of Thompson's misrepresentation. Since Epstein could not recall Thompson's words, the court would have been required to infer that Epstein correctly and completely recorded Thompson's responses, an inference which the court could refuse to draw. (See also fn. 5, *ante*.)

[7]Occidental also complains that the court's interrogatory to the jury was erroneous and prejudicial. That interrogatory asked "Did Donald Thompson reasonably answer the Medical Questionnaire . . . with that degree of candor expected of an ordinary layman applying for life insurance?" As the jury was an advisory jury only, and as the trial judge made an independent determination of the misrepresentation question, any error in the language of the interrogatory could not have been prejudicial to Occidental.

### 3. *Retention of Check*

 Occidental next contends that, even if no misrepresentation occurred, nevertheless the contract was mutually rescinded because plaintiff retained the check sent to her on September 4, 1964, by Occidental as refund of the first premium on the $100,000 policy. Plaintiff neither cashed nor endorsed the check but gave it to her attorney who, on September 25, notified Occidental of plaintiff's claim under the policy. The attorney retained the check and subsequently offered it into evidence at trial.

The United States Court of Appeals, Ninth Circuit, succinctly answered a similar contention in *Metropolitan Life Insurance Company* v. *Grant, supra,* 268 F.2d 307, 308, footnote 1, stating that ". . . there was or was not insurance coverage in effect at the time of Grant's death. The subsequent act of returning the premium is irrelevant. No contention has been made that the premium was accepted as a satisfaction of the liability under the contract. When appellant [insurer] returned the check and unequivocally disclaimed liability, no further tender was necessary as it would have been futile."

The question was primarily one of fact for the trial court to decide. (See *Conderback, Inc.* v. *Standard Oil Co.,* 239 Cal.App.2d 664, 680-681 [48 Cal.Rptr. 901].) Under the circumstances in the instant case, we believe the trial court properly found that plaintiff's retention of the check did not constitute a mutual rescission or accord and satisfaction. Certainly plaintiff, who was actively pursuing her lawsuit against Occidental, did not intend any such result.

### 4. *Limited Liability*

 Occidental's final contention is that it had limited its maximum liability for double indemnity to $35,000. Occidental relies on Insurance Code section 10115 which provides in part that "The provisions of this section shall not prohibit an insurer from limiting the maximum amount for which it may be liable prior to actual issuance and delivery of the policy of life insurance either to (1) an amount not less than its established maximum retention, or to (2) fifty thousand dollars ($50,000), if a statement to this effect is included in the application." The receipt attached to the insurance application at the time Thompson signed it provided that ". . . the Company shall not be required to make insurance effective for an amount which together with any amount effective on the Proposed Insured in the Company would exceed . . . $50,000 of benefits for death by accidental means issued with life insurance. . . ." Occidental concludes that because it paid $15,000 as accidental death benefits under the double

indemnity provisions of the $15,000 policy its maximum liability is $50,000 less the $15,000 it has already paid.

Assuming that the receipt was incorporated into the contract between Thompson and Occidental (see fn. 4, *ante*), we do not believe that Occidental thereby effectively limited its liability. ▉ Provisions which purport to exclude coverage or substantially limit liability must be set forth in plain, clear and conspicuous language. (See *Gray* v. *Zurich Insurance Co.*, 65 Cal.2d 263, 273 [54 Cal.Rptr. 104, 419 P.2d 168]; *Steven* v. *Fidelity & Casualty Co.*, 58 Cal.2d 862, 877 [27 Cal.Rptr. 172, 377 P.2d 284]; *Young* v. *Metropolitan Life Ins. Co., supra*, 272 Cal.App.2d 453, 460-461.) ▉ In the instant case, the limiting language was neither plain nor conspicuous and, according to Kelly, the limitation was not discussed with Thompson when he applied for insurance. In fact, Kelly inserted the figure $100,000 into the application and used that figure in calculating the amount of Thompson's first premium. Assuming that Thompson did read the limiting language, he might well have assumed that the clause was intended only to notify applicants for insurance that Occidental, through its soliciting agent Kelly, was not "required" by law to insure a particular applicant in excess of the amounts specified. Nothing in the receipt's language states that Occidental will not voluntarily agree to exceed these limits, as it evidently did by accepting the first premium on a $100,000 double indemnity policy.

The judgment of the trial court is affirmed.

McComb, J., Tobriner, J., and Mosk, J., concurred.

**WRIGHT, C. J.**—I dissent.

I disagree with the majority on two grounds: (1) Thompson's concealment and misrepresentation of material facts relating to his health in making application for insurance constitute grounds for rescission of any agreement which might have been entered into, and (2) no insurance contract became operative as Thompson was ultimately found to be uninsurable and no policy was issued or delivered to him.

In resolving the issue of misstatement and concealment it is necessary that we examine in depth Thompson's complete medical history as known to him at the time of the examination conducted by Dr. Epstein in behalf of the defendant insurance company.

Dr. Fieler, Thompson's family physician until 1961, testified that Thompson relied heavily on tranquilizers, sedatives and sleeping pills during the

time he was under the doctor's care. Dr. Fieler had examined and diagnosed a varicose vein problem in 1961, recommending that Thompson undergo a surgical procedure known as a vein ligation to partially alleviate the symptoms. In 1962, the vein ligation was performed by Dr. Green. Dr. Green also performed a hydrocoyle and a hernia operation on Thompson in that year.

In 1963 Thompson was examined by Dr. Conklin. Dr. Conklin testified that Thompson was a heavy drinker. The doctor found it necessary to prescribe moderately strong sleeping pills and advised Thompson to decrease his alcohol intake. Dr. Conklin last saw Thompson for laryngitis in January 1964.

Dr. Pellegrin first examined Thompson in June 1964. Thompson complained of pain in his chest, back, "in his right hip, down into his right heel, and had some swelling of his right foot." Dr. Pellegrin testified that Thompson looked "acutely ill, was very pale and was moving very gingerly; that is, no rapid movements and sort of hunched over as if in considerable discomfort." The doctor treated Thompson for pneumonia and his overall condition improved.

Thompson again visited Dr. Pellegrin in July 1964. At this time Thompson complained of pain following any exercise, including walking. The doctor concluded that Thompson was experiencing intermittent claudication.[1] Thompson told the doctor that "this pain has been present and becoming progressively worse since [he] had the vein ligation two years ago." Dr. Pellegrin took a pulse reading from which he concluded that there was diminished circulation in the arteries in both legs. In fact, the pulse in the arteries at the back of the knees and in the feet was barely palpable. The doctor also performed an electrocardiogram, finding some borderline indications which he did not consider especially significant.

Dr. James Thompson testified for the defendant that Thompson suffered from two basic conditions: varicose veins (thrombophlebitis) and hardening of the arteries (arteriosclerosis). The doctor explained that varicose veins is a common ailment which results from thickening of the veins and has a tendency to make the legs swell. Such can have serious effects if a blood clot, which may form in the vein, breaks off and flows through the veins into the heart or lungs. The other condition from which Thompson suffered, arteriosclerosis, was much more serious. This occurs when cholesterol is laid down on the interior of the walls of the arteries. As the walls get

---

[1]Intermittent claudication, as explained by Dr. Pellegrin, is a term used to describe pain which occurs in the legs with exercise and generally indicates some circulatory problem.

thicker with continuing deposits, the passageways through the arteries become narrower, thereby reducing the blood flow. The doctor indicated that, according to the medical records, the situation in Thompson's case had progressed to such an extent that the arteries were not carrying enough blood to the legs to allow Thompson to walk more than about half a block without experiencing intermittent claudication. The condition existed not only in arteries supplying the legs, where it is commonly reported, but also in arteries supplying the vital organs of the body, such as the heart, and may precipitate heart attacks or coronary occlusions. The doctor concluded that when arteriosclerosis has advanced to the degree present in Thompson, judging from his symptoms, his life expectancy would be less than one-half and probably more in the neighborhood of one-third of that of a person of Thompson's age.[2]

Thompson again visited Dr. Pellegrin in the middle of July 1964. At this time Thompson complained of increased pain in the knee and some swelling and redness about that area. He was also experiencing a recurrence of the vein problems and the doctor noted evidence of phlebitis. Dr. Pellegrin testified that he was considering two procedures for relieving the intermittent claudication: (1) order Thompson to stop smoking and (2) perform a chemical sympathectomy. He explained that smoking causes blood vessels to contract. As the pain which Thompson experienced in his legs was due to decreased circulation smoking may have been a contributing factor. Dr. Pellegrin also described the procedure for treatment by a chemical sympathectomy. He testified that the arteries are controlled by the sympathetic nervous system and that certain of the nerves are associated with the artery walls. He explained further that certain impulses cause the walls of a vessel to contract, thereby decreasing circulation. However, if such impulses are cut off the vessels are allowed to relax. The purpose of the chemical sympathectomy is to render ineffective those portions of the nervous system which cause the contractions. Dr. Pellegrin at the July visit advised Thompson to cut down on his smoking and referred him to another doctor to investigate the desirability of a chemical sympathectomy.

During the course of his testimony Dr. Pellegrin stated that the inter-

---

[2]Dr. James Thompson appeared as an expert witness for the defendant. The doctor had not examined or consulted with the plaintiff during the latter's lifetime. Although it is not disputed that plaintiff suffered from arteriosclerosis, it does not affirmatively appear that any of the medical witnesses used that precise term in advising plaintiff in connection with the symptoms of plaintiff's disorder. The significance, however, is not in the label attached to plaintiff's condition but rather in the fact that he had knowledge that he suffered from a malady which, apart from his varicose vein problem, seriously disabled him and required extreme medical procedures if it were to be alleviated.

mittent claudication had nothing to do with Thompson's vein problems. In response to a question as to whether Dr. Pellegrin had told Thompson that claudication was a symptom of a different problem from the vein problems experienced earlier, Dr. Pellegrin replied that although he could not remember exactly what he told Thompson, "I am sure I must have described it—possibly, as something to do with circulation, and this is why we were going to do all these various diagnostic studies, to find out what was going on."

On referral from Dr. Pellegrin, Thompson met with Doctors Olpin and Hodge who concluded after examination that a chemical sympathectomy should be performed as soon as necessary laboratory tests could be completed. On August 10, the day prior to the insurance examination by Dr. Epstein, Thompson met again with Dr. Olpin, a vascular surgeon. Dr. Olpin's records reflected the following notation: "Detailed discussion of proposed lumbar sympathetic block held with patient. He will call in for an appointment when he completes his lab work." Dr. Olpin testified that, to the best of his recollection, this discussion consisted of an explanation of the purpose of the operation, the technical procedure involved and the possible complications which could arise from such a procedure. Dr. Hodge, who also saw Thompson on August 10, testified that he assumed he also had conversations with Thompson with respect to claudication and varicose veins.

It must be recognized from the foregoing that Thompson suffered from and was made aware of two serious ailments at the time of his examination by Dr. Epstein: varicose veins and arteriosclerosis. Neither of such ailments could be characterized as a minor matter likely to have been of no concern to Thompson nor of interest to the defendant insurer. In fact, the evidence presented at trial established that the arteriosclerosis condition, the presence of which Thompson failed to report to Dr. Epstein, was by far the most serious of all the maladies from which Thompson suffered. The evidence also points unerringly to the fact that Thompson was aware that he was committed to serious medical procedures to alleviate the condition. It is manifest, as a matter of law, that Thompson understood and appreciated his total medical problem at the time of his examination by Dr. Epstein.

The insurance examination conducted by Dr. Epstein was admittedly abbreviated. The doctor testified without dispute, however, that it was his practice to ask all of the questions listed on the application form and to record the answers as given by the applicant. Among other questions he asked Thompson whether he had been examined by a physician in the

past five years, whether he had had an electrocardiogram, and whether he had had or been advised to have any surgical operation. Dr. Epstein entered an affirmative answer to each of these inquiries but, when asked to give details of all yes answers, including all dates and the names and addresses of all attending physicians, only the 1962 vein ligation and the hernia operation were mentioned and the name and address of Dr. Green were noted. Dr. Epstein's report of his examination of Thompson makes no mention of Thompson's consultations, examinations or treatments by (1) Dr. Fieler terminating in 1961 (conditions treated with tranquilizers, sedatives and sleeping pills), (2) Dr. Conklin in 1963 (drinking) and 1964 (laryngitis), (3) Dr. Pellegrin in June 1964 (pain in chest, back and right leg, pneumonia), in July 1964 (intermittent claudication, diminished circulation in both legs, electrocardiogram), again in mid-July 1964 (varicose veins, phlebitis, intermittent claudication treated by terminating use of tobacco with recommendation relative to chemical sympathectomy), and on August 10, 1964, the day immediately prior to the insurance examination by Dr. Epstein, and by (4) Drs. Olpin and Hodge (varicose veins, intermittent claudication to be treated by chemical sympathectomy upon completion of laboratory tests).

Most significantly, perhaps, Dr. Epstein's report does not indicate that Thompson had been instructed by Dr. Olpin the day before the examination that the chemical sympathectomy was necessary. Dr. Epstein testified that had Thompson told him that he had been so instructed Dr. Epstein would have noted it on the application. He further testified that he would have noted Thompson's visits with Drs. Pellegrin, Olpin and Hodge, the recent attacks of phlebitis, and complaints of chest pain had Thompson informed him of such matters.

At the completion of the examination Thompson signed the application, which includes in a conspicious place above his signature, the declaration: "I represent that the statements and answers shown above are complete and true to the best of my knowledge and belief."

In spite of the apparent inconsistencies, the jury, rendering an advisory finding, concluded that Thompson did not misrepresent or conceal material facts. An insurance company is entitled to demand complete and truthful answers to its inquiries respecting an applicant's medical history and condition (*Burns* v. *Prudential Ins. Co.* (1962) 201 Cal.App.2d 868, 869 [20 Cal.Rptr. 535]), and failure to disclose that which a party knows, and ought to communicate, is concealment (Ins. Code, § 330) which entitles the injured party to rescind the contract of insurance. (Ins. Code, § 331.) Likewise, misrepresentation of material facts may also furnish grounds

for rescission. (*Cohen* v. *Penn Mut. Life Ins. Co.* (1957) 48 Cal.2d 720, 725 [312 P.2d 241].) The materiality of a nondisclosure or misrepresentation is determined by the effect that truthful answers would have had on the party to whom the communication is due, in forming his estimate of the relative advantages and disadvantages of the proposed contract. (Ins. Code, § 334.)

The evidence here shows that Thompson concealed or misrepresented that he had suffered within recent months attacks of pleurisy, phlebitis, chest pain and arteriosclerosis which would not allow him to walk more than half a block without intermittent claudication. Further, he did not disclose that he had received advice the day prior to the examination that a chemical sympathectomy was necessary to relieve symptoms of the arteriosclerosis. The materiality of such misrepresentation and concealment is obvious.

The majority would reconcile the insufficiency of Dr. Epstein's medical examination and report with an implied finding that he intentionally or inadvertently failed to record the information as reported by Thompson. Dr. Epstein testified that, although the examination was cursory, it was his invariable practice to follow the format of the application form and to record all information related by the applicant. Dr. Epstein also testified that had he been told about Thompson's recent visits to the other doctors, recurrence of phlebitis, pleurisy and chest pain, the existence of intermittent claudication due to arteriosclerosis, or that Thompson had been advised to undergo a chemical sympathectomy, he would certainly have noted the information on the application.

Although a trier of fact is free to accept or reject a witness' testimony such disbelief cannot supply the existence of a fact nor may it supply substantial evidence in support of a verdict. (*Casetta* v. *United States Rubber Co.* (1968) 260 Cal.App.2d 792, 808 [67 Cal.Rptr. 645].) "A legal inference cannot flow from the nonexistence of a fact; it can be drawn only from a fact actually established. (Code Civ. Proc., §§ 1958, 1960.) It is axiomatic that 'an inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guesswork.'" (*Eramdjian* v. *Interstate Bakery Corp.* (1957) 153 Cal.App.2d 590, 602 [315 P.2d 19].) In this vein we said in *Hick* v. *Reis* (1943) 21 Cal.2d 654, 660 [134 P.2d 788], that such a rule is necessary to preclude arbitrary action by the trier of fact. We noted there that the trier of fact may not indulge in inferences which are unsupported or which are rebutted by such clear, positive and uncontradicted evidence that it is not subject to doubt in the minds of reasonable men. (See also *Isenberg* v. *California*

*Emp. Stab. Com.* (1947) 30 Cal.2d 34, 40 [180 P.2d 11]; *State of California* v. *Superior Court* (1962) 208 Cal.App.2d 659 [25 Cal.Rptr. 363].)

Dr. Epstein's testimony went entirely unrebutted by plaintiff. Even if the jury disbelieved Dr. Epstein, it does not follow that the jury could infer that the questions were not asked at all or that Dr. Epstein intentionally or inadvertently failed to record the answers as such inferences would necessarily be based on impermissible conjecture or surmise which cannot furnish evidence in support of the verdict. (See *Hicks* v. *Reis, supra,* 21 Cal.2d 654, 660; *Eramdjian* v. *Interstate Bakery Corp., supra,* 153 Cal.App.2d 590, 602.)

There is a further reason why failure to make a full disclosure cannot be charged against Occidental's agent, Dr. Epstein. The record shows that Thompson signed the certification declaring that the information contained in the application was complete and true. We said in *Telford* v. *New York Life Ins. Co.* (1937) 9 Cal.2d 103, 107 [69 P.2d 835], that there is a requirement of fair dealing by both parties to an insurance contract. This requirement includes a duty on the part of the applicant to read the application and to report to the insurer errors or omissions. By neglecting to inform the company of material omissions, the applicant assumes the responsibility therefor. (See also *Layton* v. *New York Life Ins. Co.* (1921) 55 Cal.App. 202 [202 P. 958]; *Goldstone* v. *Columbia Life etc. Co.* (1917) 33 Cal.App. 119 [164 P. 416].)

The majority, while conceding that *Telford* correctly states the law in the area, rely on decisions which indicate that a failure to notify the insurer of errors or omissions may be excused if it can be inferred that the examining doctor created an impression that additional written responses were unnecessary. The applicant must have been so misled by the examining doctor that on a reading of the application including the errors and omissions the applicant would not have cause to believe that they were material. (*Rutherford* v. *Prudential Ins. Co.* (1965) 234 Cal.App.2d 719, 727 [44 Cal.Rptr. 697].) In *Boggio* v. *Cal.-Western States Life Ins. Co.* (1952) 108 Cal.App.2d 597, 598 [239 P.2d 144], for instance, there was evidence that the soliciting agent told the insured: " 'Well as long as you do not have a medical discharge they don't care about all this. As long as you have an honorable discharge and not a medical discharge you can sign this application.' " In the case at bar, on the other hand, there was absolutely no evidence which would even suggest that Thompson was misled or had reason to believe that it was unnecessary to give truthful or complete answers to the questions asked by Dr. Epstein. The only evidence received bearing on the subject of the examination indicated that the

form was faithfully prepared and Thompson read the application before affixing his signature.

As previously noted the trier of fact was not bound to believe Dr. Epstein but, absent evidence to the contrary, it could not make findings to the contrary. (*Hicks* v. *Reis, supra,* 21 Cal.2d 654, 660; *Eramdjian* v. *Interstate Bakery Corp., supra,* 153 Cal.App.2d 590, 602.) Inasmuch as Thompson signed the application he is conclusively presumed to have known, in the absence of contrary evidence, the contents of the application and the falsity of the materials appearing therein. The application must therefore be considered an instrument in the perpetration of a fraud, and no recovery can be allowed on the policy. (*Layton* v. *New York Life Ins. Co., supra,* 55 Cal.App. 202, 206-207.)

The majority next theorize the court may have believed that Thompson, as an ordinary layman, failed to recollect or appreciate the significance of the consultations with Drs. Pellegrin, Olpin and Hodge. The majority speculate that the medical terms used by these doctors might have been meaningless jargon to Thompson and he was unable to understand the seriousness of the conditions from which he suffered or the nature of the proposed medical procedures.

Several of the doctors who had examined Thompson prior to the interview with Dr. Epstein testified that Thompson was informed and appreciated the seriousness of the diseases from which he suffered and the nature of the proposed corrective procedures. Thompson's recognition of the differences between his varicose vein problems and the arteriosclerosis condition which was causing intermittent claudication is evident from statements he made to Dr. Pellegrin. Dr. Pellegrin testified that, in describing the evolution of the intermittent claudication, Thompson had stated that the pain had been present and became progressively worse since he had the vein ligation in 1962. During the course of each examination by Dr. Pellegrin the topic of intermittent claudication was discussed. Dr. Pellegrin testified that he makes it a practice to explain to his patients the meaning and implications of the technical terms which he uses.

The nature and advisability of a chemical sympathectomy was discussed with Thompson on several occasions in consultations with three different doctors. Dr. Pellegrin first considered the operation as a possible treatment to alleviate the intermittent claudication. Dr. Olpin's records indicate that a detailed description of the proposed operation was had with Thompson in which the purpose of the operation and the procedures involved were discussed. Thompson also had occasion to inquire about the nature of the operation in consultations with Dr. Hodge. Each of these doctors also

testified that in discussing a medical problem with a patient as a matter of course they explain technical terms in attempting to insure that the patient understands his condition and proposed treatments.

There is absolutely no support in the record for the contention that Thompson did not understand or appreciate the communications of the doctors. Nor does the conclusion that Thompson did not distinguish the varicose vein problem from the disease causing intermittent claudication find support. The only reasonable conclusion which might be drawn from the testimony of the doctors who examined Thompson is that even a layman would have understood and appreciated the significance of the chemical sympathectomy. The majority's assertion that Thompson failed to appreciate the significance of the consultations is at best speculative and without support. The further assertion that Thompson may have failed to recollect extended medical consultations which ended in a recommendation of surgery only a day before the interview with Dr. Epstein is contrary to reason and to the record.

The majority next assert that the trier of fact may have concluded that Thompson's undisclosed problems related to "minor indispositions" rather than serious ailments. Such a conclusion could only result from a misreading of the evidence introduced at trial. The evidence showed without contradiction that the most serious of the conditions from which Thompson suffered was arteriosclerosis and that this was certain to shorten his life substantially. The uncontradicted testimony of a witness cannot be arbitrarily disregarded. (*Gomez* v. *Cecena* (1940) 15 Cal.2d 363, 366 [101 P.2d 477]; *Camp* v. *Ortega* (1962) 209 Cal.App.2d 275, 281 [25 Cal.Rptr. 873]; see also Evid. Code, §§ 410, 411.) Although there are exceptions to this rule when the testimony is inherently improbable (*La Jolla Casa deManana* v. *Hopkins* (1950) 98 Cal.App.2d 339, 345-346 [219 P.2d 871]), the witness is impeached (Evid. Code, § 785), or has an interest in the subject matter of the litigation (Witkin, Cal. Evidence (2d ed. 1966) § 1113), there were no such infirmities in the statements of Drs. Pellegrin, Hodge and Olpin who each testified that Thompson had been advised as to the seriousness of his ailment. Again, the trier of fact was not free to indulge in suppositions entirely contrary to the evidence.

Finally, the majority submit that the trier of fact may have concluded that the subject matter of the consultations with Drs. Pellegrin, Olpin and Hodge would not have affected defendant's decision to issue Thompson a policy. In support of this contention the majority note that the court was not required to accept contrary evidence on the issue presented by an officer of defendant. (See *McAuliffe* v. *John Hancock Mut. Life Ins. Co.*

(1966) 245 Cal.App.2d 855 [54 Cal.Rptr. 288]; Witkin, Cal. Evidence (2d ed. 1966) § 1113.) However, even if the court refused to give credence to this testimony it would have no more effect than if it had not been given. (*Market Street Ry. Co.* v. *George* (1931) 116 Cal.App. 572, 576 [3 P.2d 41].) It is inconceivable that an insurer would not have been affected by the disclosure that an applicant suffered from an advanced condition of arteriosclerosis, a malady which would shorten his life span by one-half to two-thirds.

The majority correctly state that the party alleging fraud has the burden of proof on that issue. (*Farmers Auto. etc. Exch.* v. *Calkins* (1940) 39 Cal.App.2d 390, 393 [103 P.2d 230]; *Mayfield* v. *Fidelity & Casualty Co.* (1936) 16 Cal.App.2d 611, 616 [61 P.2d 83]; Evid. Code, § 520.) The burden of proof means that the party so charged has the obligation to produce a particular state of conviction in the mind of the trier of fact as to the existence or nonexistence of a fact. (Evid. Code, §§ 115, 190, 500.) The party with the burden of proof of a fact has the initial duty of producing evidence sufficient to avoid a ruling against him on the issue. (Evid. Code, §§ 110, 550.) When the requisite degree of proof is achieved as to the existence of a particular fact, the trier thereof must assume the fact exists. (Morgan, Basic Problems of Evidence (1961) p. 19; 9 Wigmore, Evidence (3d ed. 1940) § 2485.) Usually, the party with the burden of proof is required to convince the trier of fact that the existence of the fact is more probable than its nonexistence by a preponderance of the evidence. However, in some instances a party must produce in the mind of the trier a substantially greater proof concerning the existence of a particular fact, as proof by clear and convincing evidence. (Witkin, Cal. Evidence (2d ed. 1966) § 190.)

Whichever standard of proof is applicable here, it would appear that defendant satisfied its burden of proof of fraud upon the introduction of the application certified as true and complete by Thompson, and the introduction of extensive evidence of errors and omissions with Thompson's knowledge thereof. At the very least the introduction of the foregoing would have shifted to plaintiff the burden of producing evidence to rebut the inference that Thompson committed fraud in applying for the insurance. (Witkin, Cal. Evidence (2d ed. 1966) §§ 193-195; 9 Wigmore (3d ed. 1940) Evidence, § 2487; Comment, Law Revision Commission, Evid. Code, § 550.) Inasmuch as the plaintiff failed to produce any evidence whatsoever to rebut the inference of fraud the court should have found as a matter of law that there was fraud which entitled defendant to recind any contractual obligation for which it might otherwise have been liable.

I also disagree with the conclusion of the majority that a contract of insurance was in fact entered into. The majority place great reliance on our decision in *Ransom* v. *Penn Mutual Life Ins. Co.* (1954) 43 Cal.2d 420 [274 P.2d 633]. I believe, however, that a careful examination of that decision will demonstrate that it differs from the case at bar both on its facts and its theoretical justification.

The question in *Ransom* was whether a contract of insurance arose immediately upon receipt by the insurer of the completed application accompanied by the premium payment, subject to the insurer's right to terminate the agreement if it subsequently found the applicant to be unacceptable, or whether the acceptance of the applicant as an insured was a condition precedent to the existence of the contract. The form in *Ransom* contained the following clause: " 'If the first premium is paid in full in exchange for the attached receipt signed by the Company's agent when this application is signed the insurance shall be in force, subject to the terms and conditions of the policy applied for, from the date of Part I or Part II of this application, whichever is the later, provided the Company shall be satisfied that the Proposed Insured was at that date acceptable under the Company's rules for insurance upon the plan at the rate of premium and for the amount applied for, but if such first premium is not so paid or if the Company is not satisfied as to such acceptability, no insurance shall be in force until both the first premium is paid in full and the policy is delivered while the health, habits, occupation and other facts relating to the Proposed Insured are the same as described in Part I and Part II of this application and in any amendments thereto.' " (*Id.* at p. 423.)

We held the operative factor in *Ransom* to be reliance. Initially we observed that "[t]he clause quoted above [was] subject to the interpretation that the applicant is offered a choice of either paying his first premium when he signs the application, in which event 'the insurance shall be in force . . . from the date . . . of the application,' or of paying upon receipt of the policy, in which event 'no insurance shall be in force until . . . the policy is delivered.' " (*Id.* at p. 425.) Citing *Gaunt* v. *John Hancock Mut. Life Ins. Co.* (2d Cir. 1947) 160 F.2d 599, 601, we stressed that an application must be construed as it would be understood by a lay person. We concluded that such a person would have assumed from reading the contract that he would receive immediate coverage in exchange for the early payment of his money and that he would not understand that he was left uninsured until the company, at its leisure approved the policy. "[I]t would be unconscionable to permit the company, *after using language to induce payment of the premium at that time,* to escape the obligation

which an ordinary applicant would reasonably believe had been undertaken by the insurer." (*Id.* at p. 425; italics added.)

The application in the case at bench is not reasonably susceptible to alternative constructions when read by an ordinary person.[3] It adequately informs the reader that he would not receive immediate coverage when he paid his premium unless certain, well defined conditions were met. Comparison of the provisions of the contract in *Ransom* with those in the instant case reveal that the elements of inducement and reliance which were present in *Ransom,* and the basis of our decision there, are absent here.

The application in the instant case first notifies the applicant that the policy was *not to take effect* unless the first premium *and* the policy were delivered during the lifetime of the proposed insured, except as otherwise provided in the receipt. Although at first blush the language in this and the *Ransom* contract may seem similar, the primary effect of the language in *Ransom* was to induce reliance that coverage would commence upon the payment of the premium, while Thompson was put on notice that payment would *not* result in coverage unless other conditions were met.

In *Ransom* the terms and conditions upon which immediate coverage would not be afforded were explained in a manner which was at best ambiguous, the court stating, "While some of the language tends to support the company's position, it does no more than produce an ambiguity, and the ambiguity must be resolved against defendant. [Citations.]" We concluded that the language was reasonably susceptible to the construction that immediate payment would result in immediate coverage.

On the other hand the receipt in the instant case reveals no such ambiguity and explains that if the company is satisfied with the applicant's insurability at the time of the completion of both parts of the application, "but only after such conditions are met," the insurance will be effective from the date payment of the premium is made. Otherwise, the proposed insured is informed that coverage will not begin until the policy is delivered.

The contract here, unlike that in *Ransom,* does not induce the applicant to believe that payment would result in coverage without regard to physical condition. A fair reading of the contract by an ordinary person would yield the conclusion that immediate coverage is available only if the applicant is found to be fit. Consequently, the underlying theoretical justification of the *Ransom* case is lacking and no contract came into being because

---

[3]See footnote 1 of majority opinion for text of application.

Thompson neither received the policy nor was found to be acceptable by defendant.

For either one or both of the foregoing reasons, I would reverse the judgment.

Sullivan, J., and Draper, J.,* concurred.

Appellant's petition for a rehearing was denied October 10, 1973. Wright, C. J., and Sullivan, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairman of the Judicial Council.