Filed 7/24/14  PWPG v. Primerica Life Ins. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PWPG, LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>PRIMERICA LIFE INSURANCE COMPANY,<br><br>    Defendant and Respondent. | D065467<br><br><br><br>(Super. Ct. No. CIV-DS-1015088) |

APPEAL from a judgment of the Superior Court of San Bernardino, Brian S. McCarville, Judge.  Affirmed.

David W. Allor for Plaintiff and Appellant.

Barger & Wolen and Gail E. Cohen for Defendant and Respondent.

This action arises out of defendant and respondent Primerica Life Insurance Company's (Primerica's) rescission of a life insurance policy issued on the life of Herschel White, D.C. (White), one of the principals of plaintiff and appellant PWPG, LLC (PWPG), in whose favor the policy was written.

When White applied for the policy, he denied having ever used or been treated for use of illegal drugs. After he passed away from cancer, Primerica discovered he had a history of cocaine use. On that basis, Primerica rescinded the policy.

PWPG sued, alleging breach of contract and bad faith on the part of Primerica. The court granted summary judgment in favor of Primerica, concluding that Primerica had properly rescinded White's policy because: (1) Primerica's policy application inquired about White's history of illegal drug use and counseling and/or treatment for that use, (2) White had a history of cocaine abuse and drug/alcohol counseling during the two years preceding his completion of the application, (3) White misrepresented and concealed his cocaine use and counseling on his application, and (4) White's history of cocaine abuse and counseling was material to the issuance of the Primerica policy.

PWPG appeals, asserting (1) the question on the application concerning prior drug use was ambiguous, (2) there was no admissible evidence establishing a misrepresentation, (3) there was a triable issue of fact concerning the materiality of the alleged misrepresentation, and (4) Primerica's notice of rescission was untimely. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND.

A. *White's Application for Life Insurance*

White, in addition to working as a chiropractor, was also a principal of PWPG, which owned property next to his chiropractic practice. On March 16, 2007, White met with a Primerica insurance agent and completed an application for a $2 million life insurance policy (the Policy). Question 2.d. in the application asked: "*In the past 10*

2

*years, has any person named in this application*: . . . [¶] *Received professional counseling or medical treatment due to the use of; alcohol or drugs; used illegal or illegally obtained drugs;* been convicted of drug or alcohol related charges; been convicted of a felony; or been incarcerated for any felony?"  (Italics added.)  White answered "no" to question 2.d.

White thereafter signed the application, verifying that all information provided was true and complete and agreed that Primerica could void and rescind the Policy within two years after its date of issuance if any information was determined to be false or incomplete.  The application was also signed by PWPG as the Policy's owner.

After receiving the application, Primerica conducted its underwriting process.  As part of that process Primerica arranged to have an outside vendor interview White by telephone to confirm his answers to the questions on the Primerica policy application.  Of relevance to this appeal, a transcript of the portion of the recorded interview pertaining to White's history of alcohol and drug use states:

> "Interviewer:  In the past 10 years have you received professional counseling or medical treatment due to the use of alcohol or drugs?
>
> "Dr. White:  No.
>
> "Interviewer:  Or used illegal or illegally obtained drugs?
>
> "Dr. White:  No."

Additionally, Primerica requested copies of all medical records pertaining to White from his health insurer, Kaiser Permanente (Kaiser), and reviewed those records before deciding to issue the Policy.  The records produced by Kaiser to Primerica

3

contained no mention of illegal drug use or drug counseling. Primerica also conducted a medical examination of White, but his urinalysis was negative at that point for cocaine use.

B. *Primerica Issues the Policy*

Primerica thereafter issued the Policy with a September 20, 2007 "date of issue." The Policy contains an incontestability clause which permits Primerica to contest the Policy's validity by rescission for material misrepresentation or concealment within two years after its date of issue. The Policy defines "date of issue" as "[t]he date shown on Page 3 on which We issue the Policy to You. This date controls the Incontestability and Suicide Exclusion provisions . . . ." The date shown on page 3 was September 20, 2007.

C. *PWPG Submits a Claim Under the Policy*

In 2008 PPWG learned that White was terminally ill from lung cancer. In November 2008 PWPG, as the Policy's owner and beneficiary, submitted a claim for benefits under the Policy's "Terminal Illness Accelerated Benefit" rider. That rider provides for an advance payment of benefits when the insured is diagnosed with a terminal illness. Since the Policy was within two years of its issuance, and thus within the two-year contestability period, Primerica conducted a routine investigation of White's medical history. Primerica again requested all medical records pertaining to White from Kaiser.

This time, Kaiser produced a behavioral health record dated June 30, 2005, which had not been produced in response to Primerica's initial records request during the underwriting process. This record showed that on June 30, 2005, White underwent an

4

assessment and was diagnosed by Carole Oliver (C. Oliver), a licensed clinical social worker, with: "Cocaine Abuse . . . R/O Alcohol Abuse. . . Partner Relational Problem." This record also indicated outpatient treatment by a Dr. Hacar.

D. *Primerica Attempts To Contact White*

As part of its contestability investigation, Primerica attempted to contact White, directly and through a third-party vendor, Broyles Claims Decision Support, Inc. (Broyles). Broyles placed several phone calls to White at his office, but was unable to reach him. Broyles also sent a letter dated November 24, 2008, to White's residence via Federal Express, requesting that White contact Broyles for a recorded statement. Dr. White received and signed for the letter on November 26, 2008, but never responded to any of Primerica's or Broyles's communications.

E. *Primerica Rescinds the Policy*

Primerica determined that, pursuant to its underwriting guidelines and practice, it would not have issued the Policy if it had known about White's history of cocaine abuse. Primerica sent letters on March 20, 2009 to White and PWPG, notifying them that it had rescinded the Policy. In its letter to White, Primerica advised him of the basis for its decision: White's history of cocaine use and professional counseling for that use. That letter also asked him to contact Primerica if he had any additional information that he would like Primerica to consider. White never contacted Primerica in response to that letter, either to challenge the rescission or to provide any additional information regarding the basis of the rescission, nor did he ever suggest that he was at all confused by the application.

5

After receipt of Primerica's rescission letter White wrote to Kaiser to request a copy of his records pertaining to "treatment at the mental health center . . . in San Bernardino and also at the chemical dependency treatment center on Marygold in Fontana, both sometime in 2005."

F.  *Primerica Discovers Additional Evidence of White's Cocaine Use*

1.  *White's Drug and Alcohol Counseling at Kaiser's Behavioral Health Department*

During this litigation, Primerica served subpoenas on Kaiser.  In response to those subpoenas Primerica received more records further confirming that White had used cocaine extensively and as recently as June 2005.  The records produced by Kaiser Behavioral Health in San Bernardino show that White received counseling there on June 30, 2005 from C. Oliver.  Oliver's June 30, 2005 treatment records stated that White argued with his girlfriend over his "using cocaine," that he liked to use cocaine, that he had been using cocaine for at least two years, and that he feared he would lose his girlfriend over his habits.

C. Oliver noted diagnoses of "Cocaine Abuse," "R/O Alcohol Abuse," and "Partner Relational Problem."  Under "[t]reatment plans and recommendations," she stated, in part:  "Client's goals:  Unclear.  Ambivalent whether he wants help because he knows he will be told he needs to quit substances, and he does not want to;" "CDRP [Chemical Dependency Recovery Program] referral.  Given recommendation to go and discuss this with counselor there and make his decision."

6

2. *White's Drug and Alcohol Counseling at Kaiser's Chemical Dependency Recovery Program*

On July 5, 2005, White went to Kaiser's Chemical Dependency Recovery Program (CDRP) in Fontana, California. The "Addiction Medicine Nursing Initial Assessment" form completed at that time indicated a diagnosis of "cocaine and etoh [alcohol] dependency." White reported that he had "six drinks or two drinks three times per week" for 12 years, and White also reported that he snorted "several lines" of cocaine once or twice per week. He stated that he had been using cocaine for 11 years, his most recent use being the previous Friday, and that he had "cravings" for alcohol and cocaine.

On July 7, 2005, White returned to CDRP for a counseling session with Brenda Oliver (B. Oliver),[1] a chemical dependency recovery program counselor. After that counseling session, B. Oliver created a "problem list" which documented "cocaine and alcohol dependence" as a problem and noted White's perception of this problem as follows: "I'm here because of cocaine and my [girlfriend's] ultimatum." B. Oliver also noted that White's problem "[m]ust be addressed by CDRP Outpatient Care Provider."

B. Oliver's treatment notes from White's counseling session contain several statements by White regarding his cocaine and alcohol abuse: "Drug(s) of Choice: Cocaine;" "Relationship(s): Shaky due to drug use;" "Unsafe Environment: Easy access to cocaine;" "Initial Treatment Plan: [Education] series? Reluctant to attend 12 step;" "Chief Complaint: Girlfriend found out I was using cocaine and not acceptable;" "[Patient] not very motivated to quit alcohol use but wants to stop using cocaine for his

---

[1]     Brenda Oliver is not related to C. Oliver.

[girlfriend];" "Problems Identified: Cocaine and alcohol dependent." White also informed B. Oliver during that counseling session that he had started using cocaine socially but now used cocaine "once or twice per week."

B. Oliver diagnosed White with cocaine and alcohol abuse and referred him for further treatment, including an educational series (classroom lectures regarding the impact of substance abuse), a 12-step program, and case management (individual counseling sessions). She also gave White Alcoholics Anonymous and Cocaine Anonymous booklets detailing various locations where he could attend meetings.

G. *Primerica's Underwriting Guidelines Regarding Cocaine Use*

Primerica's written underwriting guidelines and underwriting practices provide that cocaine use by an applicant within two years prior to the application, regardless of amount or frequency, results in the declination of coverage. Therefore, had Primerica known about White's cocaine use, it would not have issued the Policy.

Moreover, under Primerica's written guidelines, even if White's cocaine use were more remote (between two and five years prior to the date of the application) Primerica would not have issued the Policy at the same premium rate. Primerica would have charged a significantly higher premium rate for the Policy, amounting to an additional $10,000 in premiums per year.

H. *The Instant Action*

In November 2010 PWPG filed this action. On November 24, 2010, PWPG filed a first amended complaint, asserting causes of action for breach of contract and bad faith

8

against Primerica and a cause of action for negligence/breach of fiduciary duty against David Calzaretta, the insurance agent who sold the Policy.[2]

In January 2012 Primerica filed its motion for summary judgment, seeking dismissal of the action on the grounds that it properly rescinded the Policy due to White's material misrepresentation. The court granted the motion, finding that Primerica was entitled to summary judgment based on undisputed evidence that White misrepresented his prior drug use and that the misrepresentation was material.

In this regard, the court found:

> "Primerica properly rescinded the subject Primerica life insurance policy based upon [White's] material misrepresentation and concealment on the insurance application. It is undisputed that Question 2.d. on the application inquired whether [White] had used any illegal drugs in the previous 10 years, that [White] responded 'no' to that question, and that he signed the application attesting to the purported truthfulness of his response. It is further undisputed that [White] used cocaine on multiple occasions within five years prior to the insurance application, including during the two years preceding the application. As such, [White's] response to Question 2.d. was false. [¶] Moreover, it is undisputed that [White's] misrepresentation and concealment were material to Primerica's decision to issue the policy. The undisputed evidence shows that Primerica would not have issued the policy if it had known that [White] had used cocaine within the two years preceding the application. The undisputed evidence also shows that, even if [White] had not used cocaine within the two years preceding the application, Primerica would have charged significantly higher premiums for the policy due to his cocaine use within the years preceding the application."

This timely appeal follows.

---

[2]     Calzaretta was later dismissed from the action.

DISCUSSION

## I. *PRIMERICA'S RESCISSION WAS PROPER*

A. *Rescission Is Proper if the Application Contains a Material Misrepresentation or Omission*

"It is generally held that an insurer has a right to know all that the applicant for insurance knows regarding the state of his health and medical history. [Citations.] Material misrepresentation or concealment of such facts are grounds for rescission of the policy, and an actual intent to deceive need not be shown. [Citations.] Materiality is determined solely by the probable and reasonable effect which truthful answers would have had upon the insurer. [Citations.] The fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law." (*Thompson v. Occidental Life Ins. Co.* (1973) 9 Cal.3d 904, 915-916 (*Thompson*); *Telford v. New York Life Ins. Co.* (1937) 9 Cal.2d 103, 105 (*Telford*) ["A false representation or a concealment of fact whether intentional or unintentional, which is material to the risk vitiates the policy. The presence of an intent to deceive is not essential."]; *Kurtz, Richards, Wilson & Co. v. Insurance Communicators Marketing Corp.* (1993) 12 Cal.App.4th 1249, 1258 ["Under the Insurance Code, a false representation of material fact is a basis for rescission, and insurers are known to avail themselves of that remedy."].)

In *Telford, supra*, 9 Cal.2d 103, in reversing a judgment after trial favoring the insured plaintiff, the California Supreme Court rejected a contention that because of knowledge imputed from its agent, the defendant insurer was not actually deceived by its

10

insured's incomplete answer on the application for the policy. (*Id.* at p. 107.) Noting case law recognizing that "the requirement of fair dealing is laid on both parties to the contract," the Supreme Court observed: "This requirement entails a duty on the part of the insured to read the contract and the application in accordance with her representations and to report to the company any misrepresentations or omissions. There is no showing in the present case that the failure to read the application was due to any act of the defendant and under the decisions the facts herein do not make an exception so as to excuse the insured's failure to read it. By neglecting to inform the company of the material omissions, the insured became responsible for such misrepresentations or omissions." (*Ibid.*) Our high court concluded: "There are no circumstances in the present case which could be said to indicate that the defendant has waived the false answer of the insured by knowledge of its falsity, except the inference afforded by the [knowledge imputed from its agent]. Under the decisions the effect of this imputation of knowledge is overcome by the failure of the insured to conform to the requirement of fair dealing as a result of which she must be deemed to have adopted and approved as her own act the [agent's] omission to convey the knowledge to the defendant." (*Id.* at p. 108.)

Here, it is clear that in his application submitted to Primerica, White gave false answers to questions about medical history/treatment that were material to the risk to be insured. (*Thompson, supra*, 9 Cal.3d at pp. 915-916; *Telford, supra*, 9 Cal.2d at p. 105.) In issuing PWPG the policy Primerica was "entitled to rely on answers which negatived any such treatment." (*Telford, supra,* at p. 106.) By submitting indisputably false

11

answers to Primerica, White (and PWPF) became responsible for such misrepresentations. (*Ibid.*)

Moreover, if an insured misrepresents or omits even one material fact in his or her application, the insurer is entitled to rescind the entire contract. (*Thompson, supra,* 9 Cal.3d at p. 911; *Old Line Life Ins. Co. v. Superior Court* (1991) 229 Cal.App.3d 1600, 1604 (*Old Line*).)

Further, it is of no moment that White's cause of death was unrelated to his cocaine use. Rescission is appropriate regardless of whether there is any relation between the misrepresentation and the ultimate loss. (*Torbensen v. Family Life Ins. Co.* (1958) 163 Cal.App.2d 401, 405.)

As PWPG concedes, the test for whether a misrepresentation or omission is material, so as to provide a basis for rescission, is subjective. It is determined based on the effect of the misrepresentation or omission on the insurer in question. (*Thompson, supra,* 9 Cal.3d at p. 916; *Imperial Casualty & Indem. Co. v. Sogomonian* (1988) 198 Cal.App.3d 169, 181 (*Sogomonian*).) The only question is whether the misrepresented or omitted fact would have affected the insurer's decision to underwrite the contract. (*Old Line, supra,* 229 Cal.App.3d at p. 1604.) If the insurer would not have issued the policy if it had known the true facts, or if it would have charged a higher premium for the policy, materiality is established. (*Id.* at pp. 1605-1606.) Where the facts are undisputed, materiality is a question of law. (*Sogomonian, supra,* 198 Cal.App.3d at p. 181.)

12

B.  *The Application Was Not Ambiguous*

PWPG asserts that Primerica may not rescind the Policy because question 2.d. on the Policy application was ambiguous as to whether White was required to disclose his cocaine use history.  Specifically, PWPG contends that question 2.d is so ambiguous that an applicant could have interpreted it as only asking about prior drug use that resulted in criminal consequences or drug counseling or treatment.  This contention is unavailing.

Question 2.d. clearly asks about illegal drug use, irrespective of professional counseling or treatment for such use.  Moreover, even if the question could be interpreted as requiring only the disclosure of drug use that resulted in counseling or treatment, as opposed to mere drug use, it is undisputed that White *did* seek and receive professional counseling and treatment for his cocaine use.

PWPG asserts question 2.d. is ambiguous because it inquires about more than one aspect of White's history:  drug use, alcohol counseling, alcohol treatment, drug counseling, drug treatment, and provides for a single "yes" or "no" response.  We reject this contention.

Insurance applications routinely ask about multiple different medical conditions within the same question.  (*Thompson, supra,* 9 Cal.3d at pp. 914-915; *Cohen v. Penn Mutual Life Ins. Co.* (1957) 48 Cal.2d 720, 723.)  Moreover, question 2.d. is phrased in the disjunctive, meaning that it requires a "yes" response if *any* of the items listed in the question occurred.  White answered "no" to the entire question, indicating that *none* of the activities relating to drug use or counseling or treatment occurred.

13

PWPG asserts that "a compound application question which allows only for a single yes or no response must be considered ambiguous on its face." However, PWPG does not cite any legal authority for this proposition.

Moreover, the only case authority cited by PWPG in its opening brief on the subject of compound questions, *People ex rel. Dept. of Public Works v. Leadership Housing Sys., Inc.* (1972) 24 Cal.App.3d 164, 170 (*Leadership Housing*), is inapposite. In that case, the court analyzed a response by a witness to a compound question asked during a trial to determine which part of the question the witness was responding to. The issue on appeal was whether an expert appraiser had failed to consider the appellant's out-of-pocket, indirect, overhead costs in his analysis. The appellant argued that he did, pointing to the following testimony from the appraiser: "'Q Mr. Cotton, we have now heard the testimony in this case that the actual indirect cost—one method of allocation shows $91,000 to this particular project. Did you include any of those, or have you seen those sheets? A I don't think I have.'" (*Ibid.*)

The Court of Appeal concluded that counsel's question did not establish that the appraiser failed to include the costs in his calculation. Instead, the court held that "[i]n light of other testimony it is obvious the answer of the witness is he did not think he had 'seen those sheets.'" (*Leadership Housing, supra,* 24 Cal.App.3d at p. 170.) Thus, the court did not find the question inherently ambiguous, but rather found that other evidence presented at trial demonstrated that the witness's answer meant something other than what the appellant asserted it meant.

14

PWPG also asserts the use of semicolons in question 2.d. created an ambiguity. Specifically, PWPG claims that Primerica's use of semicolons to separate the various items enumerated in the question suggests that all six of the clauses were intended to ask a single question. PWPG bases this argument on the assertion that "[s]emicolons are generally used to connect two closely related ideas and they are not used to connect multiple clauses (unless they are separating complex lists with internal punctuation)." However, PWPG again cites no authority for this proposition.

The use of a semicolon to separate multiple alternative clauses within one sentence, as it is used in question 2.d., is proper. Question 2.d. unambiguously uses semicolons to separate a list of items, each of which is a potential alternative answer to the phrase "[i]n the past 10 years, has any person named in this application . . . ." It is clear that question 2.d. calls for a "yes" response if the applicant used illegal or illegally obtained drugs *or* received professional counseling *or* medical treatment due to the use of drugs.

PWPG proposes what it considers to be more effective ways of inquiring into illegal drug use in the application by redrafting question 2.d. in various ways. However, these proposals are of no moment. The only relevant inquiry is whether question 2.d., as drafted, is unambiguous, which we conclude it is.

PWPG cites two insurance cases in an attempt to support its position that the application is ambiguous. However, neither of these cases supports its position.

For example, in *O'Riordan v. Federal Kemper Life Assurance Co.* (2005) 36 Cal.4th 281 (*O'Riordan*), the court did *not* determine that the application question at issue

15

in that case was ambiguous as a matter of law.  In that case, the applicant failed to disclose that she smoked a "cigarette or two" during a 36-month period, and the application question arguably could be construed to inquire only about habitual use.  The court found that there was "a triable issue of fact whether [the applicant] concealed or failed to communicate material information to [the insurer] regarding her use of cigarettes in the 36 months preceding her application for life insurance at a nonsmoker rate."  (*Id.* at p. 287.)

Here, by contrast, the evidence shows that White was a habitual user of cocaine, and that he snorted "several lines" of cocaine "once or twice per week" for years.

Further, in *O'Riordan* the Court of Appeal found that the applicant "did not conceal [her smoking history] from [the insurer]" because she in fact disclosed it to the insurer's agent at the time of the application and the agent told her, "That's not really what they're looking for.  They're looking for smokers."  (*O'Riordan, supra,* 36 Cal.4th at p. 284.)  Thus, the *O'Riordan* case is inapposite.

*Farmers Auto. Inter-Ins. Exchange v. Calkins* (1940) 39 Cal.App.2d 390 also does not support PWPG's position.  In that case, the Court of Appeal examined the definition of the term "occupation" and concluded that the application answers provided by the insured, that he was a rancher, were truthful given that definition.  (*Id.* at p. 395.)  The Court of Appeal found it irrelevant that he did not disclose that he also volunteered as a firefighter because that was not considered an "occupation."  (*Id.* at pp. 394, 396.)  The *Farmers* case is inapposite because, here, the application asked directly whether White had used illegal drugs.

Further, the undisputed facts show White actually understood the question. Question 2.d. was *orally* read to White by the insurance agent, Calzaretta, and White responded orally. Following the submission of the application, question 2.d. again was orally read to White, in a recorded telephone interview, in four separate parts. White gave four separate "no" responses, including a "no" response immediately following the question "or used illegal or illegally obtained drugs?"

Even after Primerica notified White that it was rescinding the Policy due to his undisclosed cocaine use, White never claimed that he was confused by the application question or that he did not know that it required him to disclose his cocaine use. Primerica even attempted to contact White prior to the rescission. However, White did not respond to Primerica's communications.

As we have discussed in the factual background, *ante*, the undisputed evidence demonstrates that White's answer to question 2.d. was false. And the fact that some of the evidence of White's cocaine use was uncovered postlitigation does not preclude Primerica from relying on that evidence to support the rescission. (*Waller v. Truck Ins. Exchange* (1995) 11 Cal.4th 1, 31; *Earl v. Saks & Co.* (1951) 36 Cal.2d 602, 609 ["One may justify an asserted rescission by proving that at the time there was an adequate cause although it did not become known to [the rescinding party] until later."].)

C. *White's Misrepresentation Was Material*

It is clear that White's undisclosed cocaine use was material. In her declaration in support of Primerica's motion for summary judgment, Debra Walker, a 25-year employee

of Primerica and its director of underwriting, stated that Primerica would not have issued the Policy at all if it had known about White's cocaine use history.

Moreover, Walker's testimony is supported by Primerica's written underwriting guidelines and practices. Those guidelines provide that cocaine use by an applicant within two years prior to the application, regardless of amount or frequency, automatically results in the "postponement" of any application for coverage. As Walker explained, under these guidelines, Primerica would not literally "hold" an application for life insurance; it would decline the application and consider a future application from the applicant only if and when he or she reapplies for coverage and is insurable. This testimony is not challenged by PWPG.

Accordingly, White's misrepresentation was material.

PWPG asserts that, rather than decline to issue the Policy, Primerica would have merely delayed (or "postponed") its issuance until the expiration of two years from White's last-known use of cocaine, at which time Primerica would have automatically issued the Policy.

As discussed, *ante*, however, the materiality inquiry must be determined based on Primerica's actual underwriting practices, not PWPG's speculation as to what those practices might or should be. (*Sogomonian, supra,* 198 Cal.App.3d at p. 181.) The undisputed evidence establishes that if Primerica had known the truth about White's cocaine use history, it would have declined to issue any coverage to him.

18

It is undisputed that White used cocaine as recently as July 1, 2005, and that he signed the application for his Primerica policy less than two years later, on March 16, 2007.

PWPG asserts that White's July 1, 2005 cocaine use falls outside of the two-year period referenced in Primerica's underwriting guidelines because it occurred more than two years prior to the Policy's issuance date. This contention is unavailing.

As Primerica's underwriters stated in support of the motion for summary judgment, the two-year period referenced in Primerica's underwriting guidelines for cocaine use history is calculated by Primerica to run back from the date of the insurance application, not the Policy's date of issuance. Again, PWPG does not point to any evidence in the record to the contrary.

D. *Insurance Code Section 356*

PWPG asserts that Insurance Code section 356 mandates that when Primerica underwrote White's coverage, Primerica was required to calculate the two-year timeframe for cocaine use considered by the underwriters from the date of the Policy's issuance, rather than from the application date. We reject this contention.

Insurance Code section 356 provides: "The completion of the contract of insurance is the time to which a representation must be presumed to refer." Courts have interpreted this statute to impose a duty upon an applicant to disclose to the insurer any material changes in his or her health that occur *after* he or she signs the application and before the policy is issued. (*Security Life Ins. Co. v. Booms* (1916) 31 Cal.App. 119, 120-122 [interpreting Ins. Code section 356's predecessor (Civ. Code, § 2577) to permit

19

rescission where the insured truthfully denied any history of illness on the application but was diagnosed with typhoid fever between the time of the application and the time of the policy's issuance]; *Casey v. Old Line Life Ins. Co. of Am.* (N.D.Cal. 1998) 996 F.Supp. 939, 945 (*Casey*).)

Thus, Insurance Code section 356 does not support PWPG's position.

E. *Even if Primerica Had Accepted Coverage of White It Would Have Charged a Higher Premium*

Even if PWPG would not have declined to issue the Policy based upon White's cocaine use, it is clear that, at a minimum, Primerica would have charged significantly higher premiums based on White's cocaine use history. This fact by itself suffices to render White's misrepresentation material for purposes of Primerica's rescission. (*Holz Rubber Co., Inc. v. American Star Ins. Co.* (1975) 14 Cal.3d 45, 61; *Old Line, supra,* 229 Cal.App.3d at p. 1604 ["'The most generally accepted test of materiality is whether or not the matter misstated could reasonably be considered material in affecting the insurer's decision as to whether or not to enter into the contract, in estimating the degree or character of the risk, *or in fixing the premium rate thereon.*'"]; *Bennett v. Northwestern Nat'l Ins. Co.* (1927) 84 Cal.App. 130, 136 ["a misrepresentation is material which would affect the rate of premium"].)

PWPG asserts that rescission should be precluded where the misrepresented facts would have resulted in higher premiums because the remedy of reformation is available to insurers in cases of mutual mistake. This contention is unavailing.

20

This is not a case of *mutual* mistake. White knew about his cocaine use history, and Primerica did not.

PWPG asserts that Primerica would not have charged a higher premium if it had known about White's cocaine use history. We reject this contention.

PWPG's argument is directly contradicted by the undisputed evidence presented on PWPG's motion for summary judgment. Pursuant to Primerica's underwriting guidelines, even if White's cocaine use were more remote (between two and five years prior to the date of the application), Primerica would have charged a higher premium rate for the Policy. Specifically, Primerica's written underwriting guidelines show that an applicant with a history of cocaine use between two and five years prior to the application is charged a "flat extra" premium, in addition to the premium rate otherwise applicable to that applicant, in the amount of $5 per each $1,000 of coverage. In White's case, if he had stopped using cocaine more than two but less than five years prior to the date of his application (March 16, 2007), his cocaine use history would have increased his premiums by an additional $10,000 per year for the $2 million policy.

PWPG also contends that because White initially was approved for coverage at a higher "tobacco" rate, his cocaine use history would not have resulted in higher premiums. This contention is unavailing.

In making this assertion, PWPG does not cite to the record or any authority. Moreover, the deposition testimony of Walker, Primerica's director of underwriting, establishes the opposite:

21

"Q.  All right.  So an applicant that uses tobacco or has used tobacco is put into a smoker category, correct?

"A.  Tobacco category.

"Q.  A tobacco category.  Under what circumstances would they have to pay an even higher premium than another tobacco user?

"A. If there was additional medical history or occupation or hazardous. *If they were rated for something else in addition*.

"Q. Are these considered extras?

"A.  Well, it could either be a table rating or an additional flat extra or one or the other."  (Italics added.)

Based upon this testimony it is clear that "flat extras" based upon "additional medical history," i.e., cocaine abuse, are added to tobacco and non-tobacco rating tables alike.  The tables provide the starting point in determining the rate (*e.g.,* based on age, coverage amount, tobacco/non-tobacco), and the "flat extras" (additional charges) are added on top of the table rating as appropriate based on the applicant's medical and personal history (i.e., cocaine use, heart disease, cancer, occupational hazards, etc.).

F.  *PWPG's Contention That Primerica Would Have Made an "Exception" for White's Cocaine Use*

PWPG asserts that summary judgment should be reversed because there is a triable issue of fact as to whether Primerica would have made an "exception" by issuing coverage to a cocaine user at no additional premium.  This contention is also unavailing.

PWPG's contention is based on the opinion of its expert, Elliot Leitner.  However, Primerica asserted objections to 23 of Leitner's opinions, including his opinion that Primerica granted an exception to White with respect to his cocaine use, and the trial

22

court sustained each of those objections. On appeal, PWPG does not challenge the court's ruling on those objections. Thus, PWPG may not rely on Leitner's opinions on this appeal.

Moreover, PWPG asserts that Leitner "offered the opinion that Primerica would have granted PWPG an exception for White's cocaine use." Leitner did not render such an opinion in his declaration. What Leitner did say is that, in his opinion, Primerica in fact *made* an "exception" for White's cocaine use in deciding to issue the Policy in 2007 at no additional premium despite its knowledge of White's June 30, 2005 diagnosis of "cocaine abuse." Leitner's opinion is contrary to the undisputed evidence. Primerica had no knowledge of any cocaine use or cocaine abuse diagnosis until *after* PWPG made a claim for benefits, long after the Policy was issued, and thus, the trial court properly excluded that opinion.

G. *PWPG's Reliance on Thompson Decision*

Citing *Thompson, supra,* 9 Cal.3d 904, PWPG asserts that courts may choose to disregard the evidence submitted by Primerica on materiality because "the trier of fact is not required to believe the 'post mortem' testimony of an insurer's agents that insurance would have been refused had the true facts been disclosed." (*Id.* at p. 916.) We reject this contention.

That language in the *Thompson* case has been explained by subsequent California courts as applicable only to situations in which contradictory evidence regarding materiality has been presented to a *jury*, not on a motion for summary judgment where the evidence is uncontroverted. (*Wilson v. Western National Life Ins. Co* (1991) 235

23

Cal.App.3d 981, 995-996; *Casey, supra,* 996 F.Supp. at p. 948.) As the court in *Wilson, supra,* explained:

> "Plaintiff argues the trier of fact might not have believed Western's evidence that it would not have issued the policy had it known of the misrepresentation. She relies on the language we have quoted from *Thompson* . . . . [¶] The *Thompson* judgment resulted from a verdict following a jury trial, and the court was simply following the well-settled principle that a jury need not accept the testimony of any particular witness. Here, however, the evidence in support of the motion for summary judgment was uncontradicted." (*Wilson, supra,* 235 Cal.App.3d at pp. 995-996.)

H. *Primerica Timely Rescinded the Policy Within the Two-Year Contestability Period*

PWPG asserts that the two-year contestability period commenced when Dr. White's "temporary coverage" began upon his application on March 16, 2007, making Primerica's notice of rescission on March 20, 2009, untimely. This contention is unavailing.

Insurance Code section 10113.5, subdivision (a) makes clear a policy "is incontestable after it has been in force, during the lifetime of the insured, for a period of *not more than two years after its date of issue.*" (Italics added.)

As we have discussed, *ante,* the Policy defines the "date of issue" as "[t]he date shown on Page 3 on which we issue the Policy to you. This date controls the Incontestability and Suicide provisions on Part 2." On page 3 of the Policy, the date following the phrase "DATE OF ISSUE" states "September 20, 2007." Based upon that date of issue, Primerica's March 20, 2009 rescission falls well within the two-year limitation period prescribed by Insurance Code section 10113.5, subdivision (a).

24

Moreover, PWPG again does not cite any California case authority in support of its position. The conditional receipt referenced by PWPG is simply a binder that provides for temporary or preliminary insurance covering the applicant until the insurance company's investigation of insurability is completed. (1A Couch on Insurance (3d ed. 1997) § 13:1; *Smith v. Westland Life Ins. Co.* (1975) 15 Cal.3d 111, 122.)

I. *The Court's Evidentiary Rulings*

PWPG asserts the court erred in admitting White's statements to his treatment advisers concerning his cocaine use because they were hearsay. We reject this contention.

White's statements to his medical providers about his cocaine use are admissible both as nonhearsay admissions under Evidence Code section 1224 and as declarations against interest under Evidence Code section 1230.

Evidence Code section 1224 provides:

> "When the liability, obligation, or duty of a party to a civil action is based in whole or in part upon the liability, obligation, or duty of the declarant, or *when the claim or right asserted by a party to a civil action is barred or diminished by a breach of duty by the declarant, evidence of a statement made by the declarant is as admissible against the party as it would be if offered against the declarant in an action involving that liability, obligation, duty, or breach of duty.*" (Italics added.)

As we have discussed, *ante,* PWPG's claim for insurance benefits as the beneficiary of the Policy is barred by White's breach of his duty to provide truthful and accurate responses on the insurance application. White's breach, by misrepresenting his cocaine use history on the application, voids the Policy and thus bars PWPG's entitlement

25

to benefits. White's statements about his cocaine use would be admissible in any action against him involving his liability for the misrepresentations. As such, White's statements fall within the hearsay exception provided in Evidence Code section 1224.

*Atlas Assurance Co. v. McCombs Corp.* (1983) 146 Cal.App.3d 135 (*Atlas*), is instructive. In *Atlas,* an employee of a storage business stole items from the storage locker of a tenant, and the tenant sued the storage business. The storage business tendered its defense and indemnity in the lawsuit brought by the tenant to its insurer, under a policy which provided that the insurer would defend the storage business in all suits for damages except if liability arises from the criminal acts of the storage business's employees.

The insurer brought a declaratory relief action against the storage business, asserting that it was not obligated to defend the business because the underlying theft was committed by the storage business's employee. In support of its position, the insurer introduced an out-of-court statement by the employee in which he admitted that he was the thief. (*Atlas, supra,* 146 Cal.App.3d at pp. 143-144.) The trial court admitted the statement under Evidence Code section 1224, and the storage business appealed. (*Id.* at p. 146.)

The Court of Appeal affirmed, holding that the statements were admissible under Evidence Code section 1224. In doing so, the court stated:

> "[The insurer's] obligation to defend and indemnify [the storage business] depended on [the employee's] criminal liability or lack thereof. Conversely, [the storage business's] right to such indemnity and defense would be barred by [the employee's] criminal conduct. Accordingly, [the employee's] admissions were admissible against

26

> [the storage business] if they would have been admissible against [the employee] in an action involving his liability for the theft. In the latter case they would be admissible as admissions of a party. [Citation.] They were therefore admissible against [the storage business]." (*Atlas, supra,* 146 Cal.App.3d at p. 146.)

Primerica's obligation to pay benefits to PWPG under the Policy depends on whether White provided truthful responses to the application's questions, including question 2.d. Conversely, PWPG's right to such benefits as the beneficiary is barred by White's admissions of cocaine use, which substantiate that he misrepresented information on the application. Thus, White's statements would be admissible in an action against him arising out of his misrepresentations.

PWPG asserts that White, the person whose life was insured and the person responsible for answering the health questionnaire on the application, and the person who offered the "no" response to question 2.d., owed no duty to truthfully represent his history to Primerica. Rather, PWPG contends that only PWPG owed the duty to fully disclose the truth about White's medical history. This contention is unavailing.

White, as the insured, was the one who completed the application concerning his personal and health history and responded "no" to question 2.d. of the application about his drug use history. Further, White signed the application as the primary insured, certifying the veracity of those responses.

Language in the Policy itself makes clear that it was White who had a duty of full and accurate disclosure to Primerica. The Policy states that the application constitutes part of the Policy: "A copy of the application . . . is attached and is part of the Policy. Together, they are the entire contract." The application further provides: "By signing

27

this application . . . [w]e (Applicant and/all insured(s)) represent that all of the information in this Application . . . [is] true; complete; and are part of the Application. . . . We acknowledge that Primerica Life Insurance Company relies on this information to determine whether, and on what terms, to issue a policy. . . . [If] any information is determined to be false; incomplete; or incorrect, our [the applicant/insured's] policy may be rendered void."

Thus, the Policy's express language placed the duty of disclosure on White, as both the "applicant" and the "insured."

Evidence Code section 1224 permits the introduction of an out-of-court statement if, among other things, that statement would be admissible "if offered against the declarant in an action involving" the liability, obligation, duty, or breach of duty in question. PWPG asserts that this requirement is not satisfied in this case because Primerica would not have a cause of action against White in connection with his misrepresentation. We reject this contention.

Evidence Code section 1224 does not require that an action ever could or would be filed against the declarant. It merely requires that it would be admissible, i.e., that no other evidentiary issues preclude the introduction of the statement other than the fact it was made by a nonparty declarant.

Thus, the court did not abuse its discretion by admitting White's statements under Evidence Code section 1224.

Alternatively, White's statements are admissible as declarations against interest under Evidence Code section 1230, which provides:

28

"Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

White's statements that he habitually had used cocaine, an illegal drug, for years, and continued to do so on a regular basis, were contrary to his "pecuniary or proprietary interest" such "that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) White's medical records could be requested and obtained by an insurance company in connection with any application by White for life, health, or disability insurance, and the admissions could impact his ability to obtain coverage. This could further impact the premium amount he would be required to pay for such coverage.

White would not have made those statements to multiple Kaiser employees detailing his extensive cocaine use unless those statements were true. Those statements were against his pecuniary and proprietary interests, and he had no motive to make them if they were not true. White's statements thus are also admissible as declarations against interest under Evidence Code section 1230.

29

DISPOSITION

The judgment is affirmed.  Primerica shall recover its costs on appeal.


                                                                    NARES, J.


WE CONCUR:


McCONNELL, P. J.


AARON, J.